E-Filed: February 24 , 2011

GORDON SILVER
Gregory E. Garman, Esq., NV Bar No. 6654
E-mail: ggarman@gordonsilver.com
Matthew C. Zirzow Esq., NV Bar No. 7222
E-mail: mzirzow@gordonsilver.com
Gabrielle A. Hamm, Esq., NV Bar No. 11588
E-mail: ghamm@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89109
Telephone (702) 796-5555
Facsimile (702) 369-2666
*Attorneys for Debtors*

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON
Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
Victoria L. Nelson, Esq. (NV Bar No. 5436)
Email: vnelson@nevadafirm.com
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
Email: oatamoh@nevadafirm.com
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912
*Attorneys for Majority Equity Holders*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>COMMPARTNERS HOLDING CORPORATION, a Nevada corporation<br>☐ Affects this Debtor.<br>☒ Affects all Debtors.<br>☐ Affects COMMPARTNERS, LLC, a Nevada limited liability company<br>☐ Affects COMMPARTNERS CARRIER SERVICES CORPORATION, a Nevada corporation<br>☐ Affects COMMPARTNERS NETWORK SERVICES, LLC, a Nevada limited liability company | Case No.: BK-S-10-20932-LBR;  Chapter 11<br>Jointly Administered with:<br><br>10-20933    CommPartners, LLC<br>10-20934    CommPartners Carrier Services Corp.<br>10-20935    CommPartners Network Services, LLC<br><br>Disclosure Statement Hearing:<br>Date: February 3, 2011<br>Time: 9:30 a.m.<br><br>Continued Disclosure Statement Hearing:<br>Date: February 15, 2011<br>Time: 2:30 p.m.<br><br>Plan Confirmation Hearing:<br>Date: April 26-29, 2011<br>Time: 9:30 a.m. |

## THIRD AMENDED DISCLOSURE STATEMENT
## TO ACCOMPANY JOINT PLAN OF REORGANIZATION OF
## THE DEBTORS AND MAJORITY EQUITY HOLDERS

102498-002/1140438_3.doc

# Table of Contents

I. INTRODUCTION .................................................................................................... 1

II. INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT .............. 2

III. GENERAL INFORMATION ABOUT DEBTOR'S BUSINESS RESTRUCTURING
EFFORTS, AND THE FILING OF THE REORGANIZATION CASE ................................... 3

    A.    Overview of the Debtors' Business. ............................................................ 3

    B.    Management Team. ..................................................................................... 4

        1.    David S. Clark - Chief Executive Officer & Founder. ................... 4

        2.    Gregory K. Roeper – President. ...................................................... 5

    C.    The Debtors' Business Segments. ............................................................. 5

    D.    Pre-Petition Capital Structure and Financing. .......................................... 6

    E.    Events Leading to the Reorganization Case. ............................................. 7

        1.    Financial Performance. .................................................................... 7

        2.    Significant Litigation. ..................................................................... 8

    F.    The Reorganization Case And Significant Events During the Case. ............ 11

        1.    Administrative Motions. ................................................................ 11

        2.    Employment of Debtors' Professionals. ........................................ 11

        3.    Motions for Relief from the Automatic Stay. ................................ 12

        4.    Post-Petition Contracts. ................................................................ 12

        5.    Sale Motions. ................................................................................ 13

IV. OVERVIEW OF DEBTORS' ASSETS AND LIABILITIES ............................................ 13

    A.    Debtors' Assets. ....................................................................................... 13

    B.    Debtors' Liabilities. ................................................................................. 14

    C.    Disconnection Dispute. ............................................................................ 17

V. SUMMARY OF THE PLAN ................................................................................... 18

    A.    Summary of the Joint Plan. ...................................................................... 18

    B.    Claim Classification and Treatment in the Plan. ..................................... 21

VI. SUMMARY OF VOTING PROCESS ...................................................................... 22

    A.    Who May Vote to Accept or Reject the Plan. .......................................... 22

    B.    Summary of Voting Requirements. ......................................................... 23

VII. DESCRIPTION OF THE PLAN ............................................................................ 23

    A.    Overview Of Chapter 11. ......................................................................... 23

    B.    Treatment of Unclassified Claims Under the Plan. .................................. 24

        1.    Treatment Of Administrative Claims. ........................................... 24

        2.    Treatment Of Priority Tax Claims. ............................................... 25

    C.    Classification and Treatment of Claims and Equity Securities Under the Plan. ............ 26

        1.    Treatment of Class 1 (Other Priority Claims). ............................. 26

102498-002/1140438_3.doc

i

2.      Treatment of Class 2 (General Unsecured Convenience Claims). .............................. 26

3.      Treatment of Class 3 (General Unsecured Non-Carrier Claims). .............................. 26

4.      Treatment of Class 4 (General Unsecured Carrier Claims)...................................... 27

5.      Treatment of Class 5 (Penalty Claims)........................................................... 27

6.      Treatment Of Class 6 (Equity Interests). ......................................................... 28

D.      Means of Implementation of The Plan............................................................ 28

1.      Continued Existence and Vesting of Assets in Reorganized Debtor.......................... 28

2.      Management of Reorganized Debtor............................................................... 29

3.      Funding on the Effective Date and Initial Distribution. ....................................... 30

4.      Funding After the Effective Date. ................................................................. 30

5.      Procedure for Determination of Claims........................................................... 30

6.      Setoffs. ............................................................................................... 30

7.      Payments Effective Upon Tender. ................................................................. 31

8.      Post Effective Date Fees, Costs and Expenses. ................................................. 31

9.      Objections to Administrative Claims, Claims and Equity Interests. .......................... 31

10.     Valuation Of Collateral. ............................................................................ 31

11.     Transactions To Occur Prior To The Effective Date............................................ 32

12.     Transactions To Occur On The Effective Date. ................................................. 32

13.     Return Of Documents If Effective Date Does Not Occur. ..................................... 32

14.     Notice of Effectiveness............................................................................. 32

E.      Executory Contracts And Unexpired Leases. .................................................... 33

1.      Assumption and Rejection of Executory Contracts............................................. 33

2.      Approval of Assumption or Rejection............................................................. 33

3.      Cure of Defaults..................................................................................... 33

4.      Post-Petition Date Contracts and Leases. ........................................................ 33

5.      Claims Based on Rejection of Executory Contracts............................................. 33

VIII. CONDITIONS TO CONFIRMATION OF PLAN............................................................ 34

1.      Conditions To Confirmation........................................................................ 34

2.      Conditions To Effectiveness........................................................................ 34

IX. DISTRIBUTIONS UNDER THE PLAN ........................................................................ 34

1.      No Recourse. ......................................................................................... 34

2.      Manner of Distributions............................................................................. 35

3.      Timing of Distributions. ............................................................................ 35

4.      Maximum Distribution............................................................................... 35

5.      De Minimis Distributions........................................................................... 35

6.      Surrender of Instruments. .......................................................................... 35

7.      Interest on Claims.................................................................................... 36

102498-002/1140438_3.doc

8.      Allocation of Plan Distributions Between Principal and Interest................................ 36

9.      Withholding Taxes on Distributions................................................................. 36

10.     Disputed Payment of Allowed Claims or Equity Interest. .......................................... 36

11.     Unclaimed Distributions.............................................................................. 36

12.     Further Authorization. ............................................................................... 36

X. RETENTION OF JURISDICTION ................................................................................ 37

A.      In General................................................................................................. 37

B.      Plan Disputes And Enforcement. ......................................................................... 37

C.      Further Orders. ........................................................................................... 37

D.      Governmental Units Or Regulatory Agencies. ......................................................... 37

E.      Final Decree. ............................................................................................. 37

F.      Appeals.................................................................................................... 38

G.      Executory Contracts. ..................................................................................... 38

H.      Modification. ............................................................................................. 38

I.      Claims..................................................................................................... 38

J.      Determination of Tax Liability. .......................................................................... 38

XI. REVOCATION AND MODIFICATION OF PLAN ................................................................. 38

XII. RISK FACTORS .......................................................................................... 39

A.      The Debtors and Majority Equity Holders Have No Duty To Update........................... 39

B.      Information Presented Is Based on the Debtors' Books and Records, and Is Unaudited.
        39

C.      Projections and Other Forward-Looking Statements Are Not Assured, and Actual
Results May Vary. .............................................................................................. 39

D.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement. ................. 40

E.      No Admissions Made. ................................................................................... 40

F.      No Waiver of Right to Object or Right to Recover Transfers and Estate Assets. ......... 40

G.      Bankruptcy Law Risks and Considerations. ........................................................ 40

1.      Confirmation of the Plan Is Not Assured. ..................................................... 40

2.      The Effective Date or the Substantial Consummation Date Might Be Delayed or
Never Occur. .................................................................................................. 40

3.      The Projected Value of Estate Assets Might Not Be Realized................................... 41

4.      Allowed Claims May Exceed Projections. ...................................................... 41

5.      No Representations Outside of This Disclosure Statement Are Authorized.............. 42

H.      Risks Related to the Debtors' Business Operations. ............................................... 42

1.      Effect of the Bankruptcy Case. .................................................................. 42

XIII. POST EFFECTIVE DATE OPERATIONS AND PROJECTIONS ................................... 42

A.      Vesting of Assets......................................................................................... 43

B.      Retention of Causes of Action/Reservation of Rights. ........................................... 43

102498-002/1140438_3.doc

iii

XIV. DISCHARGE AND INJUNCTION ........................................................................... 43

    A.    Discharge of the Debtors, Majority Equity Holders and of Claims and Termination of Equity Interests. ........................................................................................................ 44

    B.    Term of Pre-Confirmation Injunctions or Stays. .................................................... 44

    C.    Injunction Against Interference with Plan. ............................................................. 44

    D.    Injunction. ............................................................................................................... 44

    E.    Exculpation and Limitation of Liability. ................................................................ 45

    F.    Injunction Related to Releases and Exculpation. .................................................... 46

    G.    Termination of Subordination Rights and Settlement of Related Claims. ............... 46

    H.    Release of Liens. .................................................................................................... 46

XV. POST-CONFIRMATION REPORTING AND QUARTERLY FEES TO THE UNITED STATES TRUSTEE. .................................................................................................... 47

XVI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................................... 47

XVII. CONFIRMATION OF THE PLAN ............................................................................ 48

    A.    Confirmation of a Plan. .......................................................................................... 48

    B.    Objections To Confirmation of the Plan. ............................................................... 48

    C.    Best Interest of Creditors and Liquidation Analysis. ............................................. 48

    D.    Feasibility. ............................................................................................................. 50

    E.    Accepting Impaired Class. ...................................................................................... 50

    F.    Confirmation Over Dissenting Class ("Cram Down"). ........................................... 51

    G.    Allowed Claims. ..................................................................................................... 51

    H.    Impaired Claims and Equity Interests. ................................................................... 51

    I.    Voting Procedures. ................................................................................................. 52

        1.    Submission of Ballots. ................................................................................... 52

        2.    Incomplete Ballots. ....................................................................................... 52

        3.    Withdrawal Of Ballots. .................................................................................. 52

        4.    Questions And Lost Or Damaged Ballots. ..................................................... 52

XVIII. ALTERNATIVES TO THE PLAN ........................................................................... 52

XIX. PREFERENCE AND OTHER AVOIDANCE ACTIONS ............................................. 53

XX. RECOMMENDATION AND CONCLUSION ............................................................. 54

Exhibit "A"  Debtors' and Majority Equity Holders' Joint Plan of Reorganization ................... 55

Exhibit "B"  Chapter 7 Liquidation Analysis ...................................................................... 56

Exhibit "C"  ANNUAL STATEMENT AND CASH POSITION ......................................... 57

# I.
# INTRODUCTION

On June 13, 2010 (the "Petition Date"), CommPartners Holding Corporation, a Nevada corporation ("CHC"), CommPartners, LLC, a Nevada limited liability company ("CL"), CommPartners Carrier Services Corporation, a Nevada corporation ("CCSC"), and CommPartners Network Services, LLC, a Nevada limited liability company ("CNS" and collectively, the "Debtors" or the "Company") filed voluntary Chapter[1] 11 bankruptcy petitions (the "Petitions"), thereby commencing bankruptcy cases In re CommPartners Holding Corporation, case number 10-20932-LBR; In re CommPartners, LLC, case number 10-20933; In re CommPartners Carrier Services Corp., case number 10-20934, and In re CommPartners Network Services, LLC, case number 10-20935 in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). On June 22, 2010, the Bankruptcy Court granted Debtors' Emergency Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b) and on October 7, 2010 the Bankruptcy Court granted Debtors' Motion for Substantive Consolidation nunc pro tunc to the Petition Date. The bankruptcy cases are jointly administered and substantively consolidated under the case styled In re CommPartners Holding Corporation, case number 10-20932-LBR (the "Reorganization Case").

Debtors and the Majority Equity Holders[2] have prepared this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of votes on the Joint Plan of Reorganization (as may be amended or supplemented, the "Plan") to treat the Claims of Debtors' Creditors and Equity Interests in Debtors.

**Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. In the event of a conflict or difference between the definitions used in this Disclosure Statement and in the Plan, the definitions contained in the Plan shall control.**

The various exhibits to this Disclosure Statement included in the Appendix are incorporated into and are a part of this Disclosure Statement. The Joint Plan is included as Exhibit "A" in the Appendix. Any interested party desiring further information about the Plan should contact:

---

[1] Unless otherwise expressly stated herein, all references to Chapters or Sections shall refer to title 11 of the U.S. Code (the "Bankruptcy Code"), and all Rule references shall refer to the Federal Rules of Bankruptcy Procedure (the "Rules").

[2] The Majority Equity Holders are shareholders holding over 51% of the equity of CommPartners Holding Corporation: Circle F Ventures II, LLC, Maurice J. Gallagher, Jr., Circle F Ventures, LLC, Hayden R. & LaDonna M. Fleming Revocable Trust, Jennifer Fleming Irrevocable Trust, Jessica Fleming Irrevocable Trust, Daniel A. Cartwright, Charles Snead, Jr., Gallagher Family Investments, LLC, George K. Conner and Margaret A. Conner Family Trust dated 3/7/91, Glen Tanner, Hayden R. Fleming, Hayden R. Fleming IRA, LaDonna Fleming IRA, Robert B. Goldberg, Southwest Securities, Inc. fbo Diana Sopeland IRA, Southwest Securities, Inc. fbo Hayden Fleming IRA, Southwest Securities, Ind. Fbo LaDonna Fleming IRA, Southwest Securities, Inc. fbo Patrick Fleming SEP IRA, Southwest Securities, Inc. fbo Russell Sopeland IRA, Timothy Flynn, Jennifer L. Fleming, Southwest Securities, Inc. fbo Carles D. Snead, Jr. SEP IRA, PAR Investment Partners, LP, RMC Capital, LLC. Total equity is in the amount of $56 million.

1

Santoro, Driggs, Walch, Kearney, Holley & Thompson
Attn:   Richard F. Holley, Esq.
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
(702) 791-0308 Telephone
(702) 791-1912 Facsimile
Email: Rholley@nevadafirm.com

or

Gordon Silver
Attn:   Gregory E. Garman, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
(702) 796-5555 Telephone
(702) 369-2666 Facsimile
Email: ggarman@gordonsilver.com

Interested parties may also obtain further information from the United States Bankruptcy Court for the District of Nevada at its website:  http://www.nvb.uscourts.gov.

## II.
## INFORMATION REGARDING THE PLAN AND DISCLOSURE STATEMENT

The objective of a Chapter 11 case is the confirmation (i.e., approval by the bankruptcy court) of a plan of reorganization.  A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against, and equity interests in, a debtor.  After a plan has been filed, the holders of such claims and equity securities that are impaired (as defined in Section 1124) are permitted to vote to accept or reject the plan.  Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about Debtors and the Plan to enable Creditors to make an informed decision in exercising their rights to accept or reject the Plan.  This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 and has entered an order approving this Disclosure Statement.  Approval by the Bankruptcy Court is not an opinion or ruling on the merits of this Disclosure Statement and it does not mean that the Plan has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether the Plan should be confirmed.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code.  The Bankruptcy Court will also receive and consider a Ballot summary which will present a tally of the votes of Classes accepting or rejecting the Plan cast by those entitled to vote.  Once a Plan is confirmed, the Plan will be treated essentially as a

2

contract binding on all Creditors, holders of Equity Interests, and other parties-in-interest in the Reorganization Case.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

### III.
### GENERAL INFORMATION ABOUT DEBTOR'S BUSINESS RESTRUCTURING EFFORTS, AND THE FILING OF THE REORGANIZATION CASE

**A.      Overview of the Debtors' Business.**

CHC is the parent holding company for its wholly-owned subsidiaries CL, CCSC and CNS. The Company generally does business under the name CommPartners Connect™. The Company is headquartered in Las Vegas, Nevada and is privately-held. The Company's headquarters and principal office is 8350 South Durango Drive, Suite 200, Las Vegas, Nevada 89113. The Company currently has approximately 58 employees at its Las Vegas office. The Company also has 13 employees located in Alabama, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Michigan, New York and Virginia. The Company's website is www.commpartnersconnect.com.

David Clark is the Chief Executive Officer of all of the Debtors. The members of CHC's board of directors are David Clark, Gregory Gritton, and Gregory Roeper. Maurice J. Gallagher, Jr., Jeffrey Hardesty, David Earnest, and Dan Cartwright resigned as members of CHC's board of directors effective June 2010. The members of the boards of directors of CL, CCSC and CNS are David Clark and Gregory Roeper.

The Company is a facilities based network operator providing voice over internet protocol ("VoIP") and time-division multiplexing ("TDM") services to communications carriers as well as enhanced hosted applications to small and medium sized businesses through a network of strategic partners and resellers. VoIP is a general term for a family of transmission technologies for delivery of voice communications over Internet Protocol ("IP") networks such as the Internet or other packet-switched networks. TDM is a type of digital multiplexing in which two or more signals or bit streams are transferred apparently simultaneously as sub-channels in one communication channel, but are physically taking turns on the channel. Traditional voice traffic is transmitted in TDM format.

The Company's network was built through CL, which is an authorized competitive local exchange carrier ("CLEC") in 46 states. Pursuant to its CLEC status, CL is entitled under federal law to obtain wholesale services from incumbent local exchange carriers ("ILECs") either through specialized contracts known as interconnection agreements ("ICAs"), or in some instances through traffic exchanges that may not be governed by a written agreement, as inputs to provide service to its own customers. The ILECs are either the monopoly local providers that were part of the unified Bell system or local providers (often serving rural areas) that were not part of the Bell system. CLECs also often obtain wholesale services from other CLECs or providers as inputs to provide its own services to customers.

3

Until approximately October of 2010, the Company provided domestic and international carriers with wholesale carrier services ("Carrier Services") through CCSC. In this capacity, CCSC serves as the middle man for phone calls originated on other carriers networks and terminated on yet another carriers network.

The Company provides business grade, IP-based voice and other value added services such as IP-based call centers, IP-based facsimile and IP-based call recording (the "Hosted Services") through CNS. These services are sold to end users through a dealer network of over 250 resellers spread throughout the United States.

The Company's services are supported by CommPartners Management System, a scalable and automated operational support system platform for multi-tiered billing and account management.

The Company was founded in 2003. The Company's original business premise was to take advantage of provisions in the 1996 Telecommunications Act (the "1996 Act"), which provided exemptions from certain traditional regulated access charges for companies deemed to be enhanced service providers ("ESP"). The Company believed that VoIP technology had advanced to the point where it was commercially viable and thus invested in VoIP switching gear, began applying for CLEC certifications in all 50 states, and began building a nation-wide IP-based network.

In 2005, when it became clear that the adoption of VoIP was not going to meet the Company's original projections, the Company, through CCSC, acquired a company engaged in wholesale carrier termination services thus entering the carrier services segment. For most of the next two years, the Company focused significant attention on expanding its network and growing the amount of minutes that it carried through its Carrier Services division.

Beginning in 2007, the Company concluded that the long-awaited adoption of VoIP services was close to fruition. As a result, the Company began to place less focus on carrier growth, and more focus on reducing the cost of the network, increasing the profitability of the Carrier Services segment, and growth of the Hosted Services segment. As a result of the growth of the Hosted Services segment and the emphasis on profitable carrier operations, the Company was able to increase gross margins from $811,785 in 2007 to $4,099,438 in 2009.

Beginning in 2008, the Company was first named in a lawsuit against it by a traditional carrier challenging the Company's position that the 1996 Act exempted all VoIP-originated traffic from traditional access charges as ESP. While the Company has successfully defended its position and received a favorable ruling in federal court as discussed below, increasing concerns that the Federal Communications Commission ("FCC") intends to rule on this industry question, spawned a series of additional lawsuits filed against the Company on this same matter in the past 18 months, including three within the 60 days prior to the Petition Date.

**B.    Management Team.**

     1.    **David S. Clark - Chief Executive Officer & Founder.**

Since participating in the Company's founding in June 2003, Mr. Clark has served as President, Chief Executive Officer and a member of the board of directors. Mr. Clark has overall responsibility for strategic guidance, personnel, financing, sales and corporate development/administration for the Company. It is anticipated that Mr. Clark will continue to serve in the same capacity with the Reorganized Debtor.

4

From May 1997 to January 2001, Mr. Clark was Senior Vice President, Sales & Marketing and Senior Vice President, Investor Relations for MGC/Mpower Communications. Mr. Clark's responsibilities included corporate sales and marketing development, securing and implementing nearly $1 billion in private equity, IPO, secondary equity and high yield debt financing. Mr. Clark was also the primary contact for investors and Wall Street funds and analysts at Mpower.

From February 2001 to May 2003, Mr. Clark was a principal with Gallagher Equity Management. Mr. Clark has been in the telecommunications industry since 1989 with companies spanning private pay telephone, inmate phone system, specialty satellite services and CLECs. Mr. Clark holds a Bachelor of Arts degree in Mass Communications from Texas Tech University.

### 2.  **Gregory K. Roeper – President.**

Mr. Roeper joined CommPartners in April 2007 as President. Mr. Roeper oversees the day-to-day operations of the Company. It is anticipated that Mr. Roeper will continue to serve in the same capacity with the Reorganized Debtor.

Prior to joining CommPartners, Mr. Roeper served most recently as President and CEO of Vodavi Technology, Inc., a leading provider of telecommunications systems which in 2006 was acquired by Vertical Communications. Mr. Roeper joined Vodavi in 1994 and while there held positions as the company's chief operating officer; executive vice president, finance, administration and operations; secretary of the company; and as chief financial officer and treasurer.

Prior to Vodavi Technology Inc., Mr. Roeper served as Senior Manager at a major accounting firm where he managed capital formation, deal structuring, SEC compliance, public offerings of debt and equity securities, cost reduction studies, and litigation projects.

Mr. Roeper holds a B.B.A. degree in Finance and Accounting from the University of Iowa and is a Certified Public Accountant.

### C.  **The Debtors' Business Segments.**

The Company has two business segments: Carrier Services and Hosted Services.

The Carrier Services segment provides wholesale origination and termination services to other carriers throughout the United States. Essentially, the Company contracts with either ESPs, who generate IP-based traffic, or other carriers who, in turn, have contracted with ESPs, who generate IP-based traffic, to have the traffic carried across the Company's network, convert the traffic to TDM, and hand it off to the terminating carrier. The Carrier Services segment operates in a highly competitive and price sensitive segment.

The Hosted Services segment provides small and medium-sized businesses with IP communications solutions. The Company features a full suite of business VoIP and other IP applications to help growing companies with their business communications needs. The Company's Hosted products and services include:

      a.  Hosted IP PBX Services. A set of hosted IP PBX services that delivers VoIP cost and productivity benefits including a bundle of unified communications features without the risk of obsolescence and heavy investment in capital equipment. CommPartners Connect offers two hosted IP PBX pricing models: IPSelect, which follows the traditional PBX cost model with lines and full featured

5

extensions; and IPComplete, which is sold by the seat and includes a dedicated call path as well as the robust feature set.

b. <u>IPTrunking</u>.  A versatile and cost-effective PBX integration/trunk replacement service that delivers the benefits of VoIP while retaining existing traditional or IP PBX/Key systems and internet connections for both voice and data.

c. <u>Priority Access T1 and IPDirect</u>.  A suite of broadband access services for small and medium-sized businesses ("SMBs"), offering the high reliability and quality of service of a private line managed circuit to the economics of public internet broadband service.

d. <u>Business Continuity</u>.  A business continuity and disaster recovery solution that ensures operations and telecommunication services are maintained during any disastrous incident such as catastrophic building failures, natural disasters, or network disruptions.

e. <u>Bundled Services</u>.  A suite of bundled services for SMBs from Priority Access T1 offering Quality of Service bundled with Enterprise Seats or the choice of IPTrunking options bundled with the same Priority Access T1.

f. <u>IPContactCenter</u>.  A versatile, automatic contact distribution service for call centers that provides advanced contact-handling and management, with no hardware or capital expense and streamlined installation and integration.

g. <u>IPCall Record</u>.  A powerful and reliable hosted phone call recording solution for business that is legally compliant, protects the integrity of all recorded call information, and utilizes a user-friendly web-based administration portal.

h. IPFaxSolution.  A cost-effective unified communications service that allows users to view inbound facsimile transmissions conveniently and privately via email.

i. <u>Resellers</u>.  The Company offers reseller programs for those who wish to sell VoIP and IP-based communications solutions to business customers.  The Company's White Label Wholesale reseller program enables companies to deploy hosted IP business solutions to their customers under their own brand name.

## D.    **Pre-Petition Capital Structure and Financing.**

Debtors have no secured creditors.

In connection with the founding and original capitalization of the Company, 10,290,891 shares of Common Stock were issued in 2003.  Proceeds from the issuance of these shares totaled $3,125,000.

In December 2004 and February 2005, a total of 14,400,792 shares of Preferred A Stock were issued.  Proceeds from the issuance of these shares totaled $27,378,947.  In July 2006, these shares were converted into shares of Common Stock.

At various times between July 2005 through September 2007, 810,100 shares of Common Stock were issued in connection with business combinations or stock option exercises.  Based on valuations at the time, these issuances were recorded at $1,904,343.

CHC currently has about 183 beneficial holders of common shares (commonly called the green certificates), currently holding about 25,501,783 outstanding shares of the 164,000,000

6

common shares authorized.

In the third quarter of 2006, a total of 10,482,194 shares of Preferred B Stock were issued. Proceeds from the issuance of these shares totaled $20,971,447.

In the third quarter of 2007, a total of 5,635,719 shares of Preferred B Stock were issued. Proceeds from the issuance of these shares totaled $11,271,438.

CHC currently has about 120 beneficial holders of Series B preferred shares (commonly called the orange certificates), currently holding about 16,117,913 outstanding shares of the 20,000,000 preferred shares authorized.

**E.      Events Leading to the Reorganization Case.**

     1.      **Financial Performance.**

The Debtors' unaudited[3] financial statements reflect the following historical performance on a consolidated basis:

| | 2007 | 2008 | 2009 | April 30, 2010 |
|---|---|---|---|---|
| **Total Assets** | $18,626,209 | $12,802,828 | $9,759,839 | $8,518,422 |
| **Total Liabilities** | $3,822,651 | $5,242,006 | $6,712,663 | $6,318,767 |
| | | | | |
| **Hosted Service Revenue[4]** | $3,070,307 | $5,251,585 | $7,326,717 | $2,709,706 |
| **Carrier Service Revenue** | $26,255,988 | $25,942,123 | $24,022,107 | $7,880,164 |
| | | | | |
| **Total Cost of Revenues** | $28,514,510 | $27,924,559 | $27,249,386 | $8,581,349 |
| **Gross Margin** | $811,785 | $3,269,149 | $4,099,438 | $2,008,521 |
| **Operating Loss[5]** | ($10,257,980) | ($6,863,777) | ($4,050,335) | ($798,819) |
| **Net Loss** | ($10,793,009) | ($7,627,256) | ($4,829,015) | ($957,922) |

Since early 2007, the Company's focus on accelerating Hosted Services growth while trimming unprofitable Carrier Services business resulted in an increase in gross margin from $811,785 in 2007 to $4,099,438 in 2009. The Company was beginning to experience long-anticipated growth in the high-margin Hosted Services, and Carrier Services were beginning to operate at break-even level. In January 2010, the Company reported its first ever positive cash flow month.

---

[3] Audited financial statements are only available for the Company through 2007.

[4] As many of the Debtors' customers are resellers to other parties, a significant percentage of the Debtors' Hosted Services Revenue and Carrier Services Revenue are not subject to certain taxes such as excise taxes, nor are they subject to the Universal Service Fund assessments.

[5] Before goodwill impairment and amortization.

102498-002/1140438_3.doc

Beginning in March 2010, however, Carrier Services began experiencing a sharp reduction in traffic thus significantly reducing monthly revenue. The Company's largest customer reported the loss of several large customers and the Company learned that there is an increasing industry trend for carriers to directly connect or "peer" with one another (which is now significantly less expensive utilizing IP technology), thus eliminating the need for a middle man or wholesaler such as the Company. With the loss of this traffic in the marketplace, many of the Company's competitors began reducing rates in order to gain back market-share. The Company was forced to follow suit, thus resulting in reduced average selling prices as well as volumes. Thus the positive cash flows in January and February turned negative in March, April and May of 2010. Debtors expect this trend to continue, which is one of the reasons the Debtors are selling the Carrier Services business segment.

### 2.    **Significant Litigation.**

In addition to competitive and market pressures experienced with respect to the Debtors' Carrier Services segment, the most significant drag on the Debtors' business has been various pending litigations relating to the Carrier Services business involving disputed charges against the Company (collectively, the "VoIP Lawsuits"). The VoIP Lawsuits were the primary cause of the Debtors' Chapter 11 filing. The VoIP Litigation arises from a dispute between traditional carriers and ESPs regarding the applicable regulations.

### a.    Regulatory Background.

TDM traffic is subject, according to the 1996 Act, to one of two different types of compensation regimes depending on the nature and geographic scope of the traffic. First, for long distance traffic (calls that cross local calling boundaries or state boundaries), switched access charges apply. These charges are paid by interexchange common carriers to compensate local carriers for the use of their local network facilities to terminate long distance traffic to the recipient. These charges are subsidized to keep the cost of local service low. Second, for local calls that originate and terminate on different local carriers' networks within a local calling area, reciprocal compensation ("Reciprocal Comp.") applies. Reciprocal Comp. is a negotiated rate that two local carriers charge one another for the ingress/egress of traffic exchanged between their respective networks. Historically, Recip. Comp. rates have been significantly lower than tariffed switched access rates. Switched access charges and Reciprocal Comp. are mutually exclusive.

As the 1996 Act was crafted, there was a recognition that new technologies like dial-up internet service were coming to the market and could not bear the weight of the compensation regime as established for traditional telephone carriers. As such, the 1996 Act carves out an exemption from switched access charges for ESPs, which essentially covers communications companies that deal in data format to deliver services to the market rather than traditional telephone services.

The key economic assumption that underlies the Company's business is that VoIP-originated traffic falls under the definition of an "enhanced service" and therefore is subject to the ESP exemption in the 1996 Act. In sum, it was always the understanding of the Company (and other VoIP providers) that VoIP-originated traffic is not subject to traditional access charges, and is particular, switched access charges, and thus is substantially less costly than traditional access charges.

The FCC opened a "Notice of Proposed Rulemaking" in February of 2004, which the

8

Company anticipated would take 12 months and would result in either the FCC ruling that VoIP was "free" of access charges, or that if a compensation regime was going to be established for VoIP, it would fall under the Reciprocal Comp. mechanism with rate structures that facilitated the technology and service providers to grow. However, to date, the FCC has taken no action.

In February of 2010, the FCC released their National Broadband Plan, and contained in the proposal was an outline of the FCC's intent for handling the regulation of VoIP traffic. The specifics of this regulatory plan are to be introduced in the fourth quarter of this year. While not all details are known, the Debtors believe that information released appears to support the Company's position regarding the regulation of VoIP traffic.

Traditional carriers, seeing the potential and to subsidized switched access rate revenue streams, have initiated litigation against the Company and other VoIP providers ahead of a formal ruling by the FCC. In the vacuum created by the inaction of the FCC, various states are beginning to become active and take positions that the states, not the federal government, are responsible for the regulation of VoIP. The lack of a firm regulatory regime has spurred litigation at an alarming rate not only against the Debtors, but against other VoIP providers as well. As of the Petition Date, the Debtors had at least six (6) cases or proceedings pending against it in federal and state courts and state public utility and related commissions (the "VoIP Lawsuits"). Specifically, CL is a defendant or party in the following disputed access charge cases:

      (i)     The 3 Rivers Litigation (discussed below).

      (ii)    The Paetec Litigation (discussed below).

      (iii)   Buffalo Valley Telephone Co., et al., Pennsylvania Public Utility Commission, Docket Nos. C-2009-2105918 and C-201002167305.

      (iv)   North County Communication Corp., Superior Court, County of San Diego, California, Case No. 37-2008-0075605-CU-BC-CTL.

      (v)    Calaveras Telephone Co., et al., California Public Utilities Commission, Proceeding No. C1001016.

      (vi)   Blue Ridge Telephone Co., Georgia Public Service Commission (2010).

AT&T Litigation. CL was a complainant against Pacific Bell Telephone Company, d/b/a AT&T California ("AT&T"), as defendant, in Proceeding No. C0801007 before the California Public Utilities Commission (the "California PUC"), which involves disputed charges allegedly owing by CL to AT&T in the current alleged amount of approximately $1,350,000. These amounts were upheld by the California PUC, and CL has appealed the California PUC's decision to the U.S. District Court for the Northern District of California, Case No. C-10-02164-CRB. In addition, the Company has filed intrinsic fraud charges against AT&T as it relates to conduct of the California PUC case. The Company seeks to have the disputed charges eliminated and also seeks recovery of approximately $400,000 in charges it believes were unnecessarily paid to AT&T. This appeal remains pending. Notably, this litigation differs from the other legal actions discussed in this Disclosure Statement in that this litigation involves disputed network facility charges, not access charges.

As a result of these disputed charges, AT&T set a deadline of June 14, 2010 for the Company to make payment in full of this alleged outstanding balance or have all current orders

9

and customer service activities suspended.  Based upon this timeline, the Company also expected to receive notice from AT&T on or about June 29, 2010 that the Company would have 16 days for full payment or network disconnection activities will begin, which would lead to a potential shutdown on July 14, 2010 when AT&T could have shut down the Company's entire network in California without the filing of the Reorganization Case.  This would have left approximately 25% of the Company's Hosted Services base of business, which is in California, in jeopardy.  Moreover, AT&T's alleged ability to continue billing for such disputed charges in California going forward adds $26,000 in fixed costs to the Company's network per month.

3 Rivers Litigation.  CL is a defendant in an action commenced by 3 Rivers Telephone Cooperative, et al. (collectively, the "Montana Carriers") as plaintiffs, currently pending in the U.S. District Court for the District of Montana (the "Montana Court"), Case No. CV-08-68-M-DWM (the "Montana Carriers Litigation").  In this action, the Montana Carriers seeks to recover access charges allegedly owing by CL for use of the Montana Carriers' local network facilities to complete long distance calls, among other claims for relief.  The Montana Carriers Litigation was stayed as a result of Debtors' bankruptcy filing.  The Montana Carriers are seeking approximately $1,200,000 in damages.  CL disputes these charges for the reasons as more specifically set forth in the Regulatory Background section, below.

Paetec Litigation.  CL is a defendant in an action commenced by Paetec Communications, Inc. ("Paetec"), as plaintiff, currently pending in the U.S. District Court for the District of Columbia as Case No. 08-0397 (the "Paetec Litigation").  In this action, Paetec sought to recover access charges from CL for its use of Paetec's local network facilities to complete long distance calls, among other claims for relief.  On February 18, 2010, the District Court entered an opinion and order (the "District Court Opinion"), as amended March 5, 2010, which held that Paetec's tariffs do not apply to VoIP-originated calls originated on CommPartners' network, for two reasons: (a) its termination of VoIP-originated calls is an "information service" exempt from access charges; and (b) access charges cannot apply to VoIP-originated calls because Reciprocal Compensation applies instead.  The rulings of other courts are consistent with the District Court Opinion.  See Southwest Bell Tel., L.P. v. Missouri Pub. Serv. Comm., 461 F. Supp. 2d 1055, 1074 (E.D. Mo. 2006); Vonage Hold. Corp. v. Minnesota Pub. Util. Comm'n, 290 F. Supp. 2d 993, 999-1001 (D. Minn. 2003); INS v. Qwest Corp., 466 F.3d 1091, 1093-95 (8th Cir. 2006).

To date, there has been no definitive resolution of whether access charges may be applied to VoIP-originated traffic.  State regulatory agencies and courts have interpreted interconnection agreement provisions that purport to apply access charges to VoIP-originated traffic with differing results.  The District Court Opinion voided a competitive carrier's tariff which attempted to apply access charges to VoIP-originated traffic.  A number of cases have been stayed pending a final determination of the handling of VoIP traffic from the FCC.  However, the FCC has announced that intercarrier compensation reform will be one of the subjects of its February 8, 2011 meeting.[6]

Carrier Claims.  In addition to the VoIP lawsuits, traditional carriers have also filed numerous claims in Debtors' bankruptcy proceedings for invoices based upon full access charges (the "Carrier Claims" and together with the VoIP Lawsuits, the "VoIP Litigation").  Because the company believes its IP-based traffic is exempt from these charges, the Debtor contests most of

---

[6] See http://www.fcc.gov/Daily_Releases/Daily_Business/2011/db0201/DOC-304412A1.pdf; http://www.fcc.gov/whitepaper_011811.pdf.

the approximately $28.8 of Carrier Claims asserted against the Debtors in this Reorganization Case. The Debtor recognizes that a portion of the Carrier Claims may be based on interexchange traffic that was TDM-originated, rather than VoIP-originated. The Debtors and the Majority Equity Holders would not contest any portion of the Carrier Claims based upon interexchange traffic that was TDM-originated under the 1996 Act, though such Claims may be disputed on other grounds. Approximately $28.8 million of the approximately $32.1 million in Claims filed in the Chapter 11 Case consist of Carrier Claims classified under Class 4 of the Plan. Of the Carrier Claims, approximately $1,357,054 is for E911 charges that are the subject of the AT&T Litigation, and is therefore disputed. Of the remaining $27.4 million in Carrier Claims, the Debtors estimate that approximately $4,000,000 are allowable claims for TDM-originated interexchange traffic or other non-VoIP charges, which estimate is based upon historical consumer usage.

F.    **The Reorganization Case And Significant Events During the Case.**

On June 13, 2010 (the "Petition Date"), Debtors filed their Voluntary Petitions, commencing the Reorganization Case.

1.    **Administrative Motions.**

On the Petition Date, Debtors filed several "First Day Motions" to assist in the smooth transition into the Chapter 11 process. Specifically, Debtors filed an Emergency Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b), which was approved on June 22, 2010; an Emergency Motion for Order (I) Authorizing the Debtors to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses and Other Employee Obligations, and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, which was approved on June 23, 2010; and an Emergency Motion for Order Authorizing Debtors to Pay Pre-Petition Taxes, Fees and Universal Service Charges Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541(d), which was also approved on June 23, 2010.

On July 2, 2010, Debtors filed a Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for an Order Determining that Certain Entities are not Utilities, or in the Alternative, that Adequate Assurances Have Been Provided, seeking on order determining that adequate assurances need not be provided to any of the Debtors' creditors asserting Carrier Claims as the Debtors are not "utilities" within the meaning of the statute, or in the alternative, to the extent any are determined to be utilities, that adequate assurances were provided. The Motion was resolved by a Court approved stipulation on August 24, 2010.

On August 31, 2010, Debtors filed a Motion for Substantive Consolidation of the Bankruptcy Estates of CommPartners Holding Corporation, CommPartners, LLC, CommPartners Carrier Services Corporation, and CommPartners Network Services, LLC Nunc Pro Tunc to the Petition Date. The Motion was granted on October 7, 2010.

2.    **Employment of Debtors' Professionals.**

On June 25, 2010, Debtors filed their Application For Order Approving Employment Of Gordon Silver As Attorneys for Debtor, which application was approved by entry of an order on August 5, 2010.

On that same day, June 25, 2010, Debtors filed their Application for Order Approving Employment of the Law Offices of Anita Taff-Rice as Special Counsel for the Debtors, whereby Debtors sought to employ the Law Offices of Anita Taff-Rice as special regulatory counsel. The

11

Bankruptcy Court entered an order approving the application on August 5, 2010.  On August 6, 2010, Debtors filed an <u>Application for Order Authorizing the Employment of Koch, Platner & Reed as Tax Accountants for the Debtors</u> and an <u>Application for Order Authorizing the Employment of Focused Business Solutions, LLC as Cost Recovery Service Providers for the Debtors</u>, both of which were approved on September 15, 2010.  Finally, on August 30, 2010, Debtors filed their <u>Application for Order Approving the Employment Of Jon M. Hesse, P.C. as Special Counsel for the Debtors</u>, which application sought authorization to employ Jon M. Hesse as special counsel with respect to the Montana Carriers Litigation.  The application was approved by entry of an order on October 5, 2010.

On August 10, 2010, Debtors filed <u>Debtors' Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals</u>, which Administrative Order was entered on September 15, 2010.

### 3.    **Motions for Relief from the Automatic Stay.**

On June 22, 2010, Paetec filed a <u>Motion for Relief from the Automatic Stay</u> seeking an order lifting the automatic stay to allow Paetec to continue the prosecution of its appeal under 28 U.S.C. § 1292 to the United States Court of Appeals for the District of Columbia of the District Court Opinion issued by the United States District Court for the District of Columbia on cross motions for summary judgment in the case styled <u>Paetec Communications, Inc. v. CommPartners, LLC</u>, Civil Action No. 1:08-CV-0397(JR) (D. D.C.).  Debtors opposed the Motion for Relief, claiming that there was an inadequate basis for relief from stay to continue the litigation.  On July 30, 2010, the Court entered an order denying Paetec's Motion.

On October 12, 2010, the Montana Carriers filed a <u>Motion to Lift Stay</u> seeking to modify the automatic stay so that they could return to the Montana Court to proceed with the Montana Carriers Litigation to liquidate their alleged claims.  On November 22, 2010, the Court held a hearing and denied the request by the Montana Carriers.

### 4.    **Post-Petition Contracts.**

On July 23, 2010, CCSC and CNS filed a <u>Motion for Order Authorizing CommPartners Carrier Services Corporation and CommPartners Network Services, LLC to Enter into Master Service Agreements with VoIP360, Inc. and 360Networks (USA), Inc. Pursuant to 11 U.S.C. §§ 363 and 1108</u>, seeking authority to enter into new agreements for VoIP calling services with VoIP360, Inc. and 360networks (USA) Inc., respectively.  On September 15, 2010, the Bankruptcy Court entered an order approving the motion.

On November 3, 2010, Debtors filed a <u>Motion for Order Authorizing and Approving: (i) Rejection of Internap Master Services Agreement Pursuant to 11 U.S.C. § 365; and (ii) Entry into Master Services Agreement with Switch Communications Group L.L.C. and Related Agreements Pursuant to 11 U.S.C. § 363</u>, seeking authority to reject an existing agreement for collocation space in Chicago, Illinois and move Debtors' telecommunications equipment to a local facility in the Las Vegas area.  On November 22, 2010, the Bankruptcy Court held a hearing and orally approved the motion.

Along with the foregoing motion, Debtors have filed a series of other motions seeking rejection of various executory contracts and unexpired leases in the ordinary course of Debtors' business.  Excluding any motions which are currently pending and set for hearing, the Court has entered orders approving such motions or stipulations resolving the motions.

12

5.    **Sale Motions.**

During the pendency of this Reorganization Case, Debtors undertook efforts to sell their Carrier Services and Hosted Services business segments.

On October 8, 2010, Debtors filed a Motion for Order: (i) Approving Procedures for the Sale of Debtors' Hosted Services Assets, (ii) Authorizing the Sale of the Hosted Services Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (iv) Granting Related Relief (the "Hosted Services Sale Motion") and a Motion for Order: (i) Approving Procedures for the Sale of Debtors' Carrier Services Assets, (ii) Authorizing the Sale of the Carrier Services Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (iv) Granting Related Relief (the "Carrier Services Sale Motion," and together with the Hosted Services Sale Motion, the "Sale Motions").

The Bankruptcy Court granted the Carrier Services Sale Motion, and the sales procedures and purchaser protections set forth therein, at a hearing on October 25, 2010, and at a hearing held on November 22, 2010, approved the sale of the Carrier Services segment on a final basis. Feature Group IP Southeast, LLC, a Nevada limited liability company, WorldCall Internet, Inc. and Peering Partners Communications, LLC (collectively, the "Carrier Services Purchaser") was the winning bidder for the Debtors' Carrier Services segment. On or about December 8, 2010, the Debtors entered into a final Asset Purchase Agreement with the Carrier Services Purchaser (the "Carrier Purchase Agreement").

## IV.
## OVERVIEW OF DEBTORS' ASSETS AND LIABILITIES

A.    **Debtors' Assets.**

The Debtors own no real property. Instead, the Debtors' Assets consist of various tangible and intangible personal property interests associated with (i) the Carrier Services segment, and (ii) the Hosted Services segment. On November 22, 2010, the Bankruptcy Court approved the sale of all or substantially all of the Assets associated with the Carrier Services segment, as described above (the "Carrier Services Sale"). On or about January 6, 2011, the proceeds from the Carrier Services Sale in the amount of $578,720 were transferred to the Debtors.

The Hosted Services segment consists of the Debtors' VoIP business and other IP applications, including the services commonly known as Hosted IP PBX Services™, IPSelect™, IPComplete™, IPTrunking™, Priority Access T1 and IPDirect™, IPContactCenter™, IPFaxSolution™, CommPartners Connect for Linksys One™. Specifically, the Hosted Services segment consists of (i) tangible assets, including, without limitation, fixed assets, furniture, fixtures, machines, equipment, inventories and computer hardware related to the Hosted Services segment, (ii) intellectual property, including trademarks, trade names, industrial designs, copyrights, licenses (relating to rights to use intellectual property and software programs) and inventions used directly in the operation of the Hosted Services segment, (iii) certain software developed, in part, by the Debtors; (iv) web sites and domains used by the Debtors, including the related content related to the Hosted Services segment; (v) numerous contracts, including master service agreements, wholesale service agreements, IPTrunking™ dealer agreements, and

13

wholesale partner agreements; (vi) related books and records; (vii) certain claims and causes of action; (viii) credits, deferred charges, refunds and prepaid expenses and deposits relating to the Hosted Services segment; (ix) goodwill associated with the Hosted Services segment; (x) accounts receivable directly related to the Hosted Services segment; and (xi) a promissory note and related security interests. The Debtors believe that the going-concern value of the Hosted Services business segment is approximately $4,000,000.

In addition to the above-described Assets, the Debtors believe that as of the Effective Date of the Plan, the Debtors will have approximately $750,000 in cash on hand and $950,000 in uncollected accounts receivable.

**B.    Debtors' Liabilities.**

As of the Claims Bar Date, the total amount of General Unsecured Claims, including Priority General Unsecured Claims, asserted against the Debtors' estates to which the Debtors have not filed an objection, along with the Claims included on the Debtors' Schedules, is approximately $32,666,500. The Claims Bar Date for claims other than (i) Claims arising from the Debtors' rejection of an executory contract or unexpired lease, (i) Administrative Claims, and (iii) Claims of governmental units, has passed. The Debtors believe it is unlikely that there will be any additional Allowed Claims of governmental units filed after the Claims Bar Date, and Claims arising from the Debtors' rejection of executory contracts and unexpired leases will be insubstantial. Therefore, the Debtors believe that the total asserted General Unsecured Claims will not substantially increase.

Carrier Claims (Class 4 General Unsecured Carrier Claims). Of the total General Unsecured Claims asserted, approximately $28.8 million consist of Carrier Claims. The majority of the Carrier Claims consist of Claims asserted in connection with the VoIP Litigation, and thus are disputed. The top five largest proofs of claim filed for VoIP access charges in the Debtors' Reorganization Case are as follows:

| Claimant | Claim No. | Dated Filed | Amount |
|----------|-----------|-------------|--------|
| Verizon | 34 | 10/19/10 | $8,029,829 |
| BellSouth/AT&T | 38 | 10/4/10 | $3,705,756 |
| Windstream | 72 | 10/20/10 | $1,950,602 |
| Paetec | 38 | 10/20/10 | $1,354,318 |
| CenturyLink | 28 | 9/14/10 | $1,160,126 |
| *Total* | | | *$16,200,631* |

In addition to the foregoing largest claims, the Debtors estimate that there are approximately 70 parties who have filed smaller claims based on disputed VoIP-originated access charges in this Reorganization Case. For the reasons discussed above, the Debtors believe that these claims based on VoIP-originated traffic are without merit and ultimately will be disallowed. Based upon historical consumer practices, the Debtors have estimated that approximately $4 million are allowable claims for TDM-originated interexchange traffic or other non-VoIP charges. However, if the claims based on VoIP-originated traffic are allowed, the total liabilities of the Debtors' estates for Carrier Claims incurred prepetition may be approximately $27.4 to $28.8 million.

14

Of the $28.9 million in asserted General Unsecured Carrier Claims, approximately $1.35 million consists of a Claim arising from the AT&T Litigation. As discussed above, the Debtors dispute this Claim and believe that the Debtors are entitled to a refund of $400,000.

<u>Non-Carrier General Unsecured Claims.</u>  To date, approximately $763,000 in General Unsecured Non-Carrier Claims have been filed in the Debtors' Chapter 11 Case. Further, General Unsecured Claims included in the Debtors' Schedules for which it appears no Proofs of Claim have been filed are approximately $500,000. The Debtors believe that some of these Claims may be duplicative of filed Proofs of Claims though it is not evident from the Proofs of Claim. Finally, the Debtors believe that Proofs of Claim for lease rejection damages may be filed in the approximate amount of $540,000. Of these Non-Carrier General Unsecured Claims, approximately $13,000 are General Unsecured Convenience Claims. Therefore, the approximate amount of Claims in Class 3 of the Plan is $750,000 to $1.8 million.

<u>Carrier Administrative Claims.</u>  To the extent that VoIP traffic is not exempt under the 1996 Act, or at least charged at a reduced rate, the Debtors may be subject to significant post-petition Administrative Claims on account of the VoIP services provided post-petition. Because no Bar Date for Administrative Claims by Carriers was set prior to the date of this Disclosure Statement, the amount of potential Carrier Administrative Claims which will be asserted against the Debtors pursuant to Section 503(b) of the Bankruptcy Code, including any VoIP charges allegedly arising post-petition, is unknown, and to date, no Carrier Administrative Claims have been filed.[7]

The Bar Date for Administrative Claims is March 21, 2011, as more fully discussed in Section VII.B.1, below. Subsequent to the Bar Date, the Debtors or the Plan Proponents will request estimation of the allowable amount of such Administrative Claims for the purpose of Confirmation.

However, at this time, the Debtors estimate that such Administrative Claims may be approximately $3.9 to 4.0 million. Of this, the Debtors have estimated that the charges for TDM-originated interexchange traffic and other non-VoIP charges may be as much as $1 million, though the Debtors believe this is a very conservative estimate and that ultimately, the Allowed Administrative Claims for TDM-originated interchange traffic and other non-VoIP charges may be several hundred thousand dollars less. The Debtors and the Majority Equity Holders would not contest any portion of the Carriers' Administrative Claims established to be based upon interexchange traffic that was TDM-originated (or otherwise are non-VoIP) under the 1996 Act, though such Administrative Claims may be disputed on other grounds.

To the extent Carrier Administrative Claims for VoIP access charges are allowed, the Distributions available for distribution under the Plan to the holders of Allowed Unsecured

---

[7] U.S. TelePacific Corp., Mpower Communications Corp., and Arrival Communications, Inc. allege that they hold postpetition Administrative Claims in the amount of $368,163.38. See Objections to Proposed Disclosure Statement to Accompany Joint Plan of Reorganization of the Debtors and the Majority Equity Holders (#396) Filed by U.S. TelePacific Corp., Mpower Communications, and Arrival Communications (ECF No. 431). As no application for allowance of administrative expenses has been filed by U.S. TelePacific Corp., Mpower Communications Corp., or Arrival Communications, Inc., the Debtors are unable to state with certainty their position regarding the allowability of these alleged Administrative Claims. However, any VoIP termination charges will be disputed for the reasons discussed in Section III.E.2 (Significant Litigation), above.

15

Claims will be drastically reduced, and if such Claims exceed the total value of the Estate's Assets, there will be no distribution to the holders of Allowed Unsecured Claims; however, the distribution to Equity Holders of the New Common Stock will not be affected due to the New Equity Payment of approximately $5 million as consideration for the New Equity Interest to be issued under the Plan.

USAC Claims. On October 26, 2010, USAC filed its *Motion for Entry of an Order Allowing and Directing the Immediate Payment of Universal Service Fees Accrued and Accruing Post-Petition* (the "USAC Administrative Claim") (ECF No. 301). As set forth therein, USAC contends that its Administrative Claim totaled approximately $559,858.92 as of October 26, 2010 (the "USF Obligations").[8] On November 17, 2010, the Debtors filed an Opposition to the USAC Administrative Claim Motion (ECF No. 364) arguing, among other things, that the Debtors had previously submitted an appeal to USAC regarding the Debtors' outstanding USF Obligations because the Debtors had over-stated revenue projections for the third quarter of 2010. The Debtors, therefore, anticipate that the USAC Administrative Claim will ultimately be significantly reduced, if not eliminated.

In December of 2010, USAC and the Debtors reached an interim agreement regarding the pending USAC Administrative Claim, which the Bankruptcy Court approved in the *Amended Stipulated Order (I) Requiring Debtors to Submit the 2011 Form 499-A When Due and (II) Scheduling Status Conference Regarding the Motion of Universal Service Administrative Company for Entry of an Order Allowing and Directing the Immediate Payment of Universal Service Fees Accrued and Accruing Post-Petition* (ECF No. 408) (the "Stipulated Order"). Among other things, the Stipulated Order requires the Debtors to remain in compliance with all USF reporting obligations and to timely file the required 2011 Form 499-A (reporting revenue information for calendar year 2010) (the "2011 Annual Revenue Report"). The USAC Administrative Claim Motion remains pending at this time and is scheduled for further hearing on May 3, 2011.

After submission of the 2011 Annual Revenue Report by the Debtors, USAC will conduct the 2011 Annual True-Up and the final amount of USAC's Administrative Claim will be adjusted. In addition, the Debtors may be entitled to amend previously-filed revenue reports within a limited period of time, and any such amendments may also alter USAC's Administrative Claim.

USAC has informed the Debtors that Annual Revenue Reports submitted to USAC by the Debtors reporting 2007, 2008 and 2009 revenues require amendment in order to accurately reflect the Debtors' gross revenues as disclosed in this Disclosure Statement. The Debtors are in the process of reviewing and, if necessary, submitting Amended Annual Revenue Reports to USAC as may be necessary. USAC has reserved its right to recalculate USF obligations based on any amended forms submitted by the Debtors and, if necessary, amend its pre-petition and administrative claims. Debtors reserve the right to object to any claims filed by USAC.

---

[8] USAC contends that, as of January 15, 2011, the Debtors' outstanding post-petition balance (i.e., their USF Obligations) totaled $576,361.85.

16

Other Administrative Claims.  In addition to the potential Administrative Claims discussed above, Windmill Durango Office II (the "Landlord"), the lessor under an Office Space Lease Agreement dated April 28, 2008 (the "Lease") for the lease of office space located at 8350 S. Durango Drive, Las Vegas, Nevada, may assert an Administrative Claim for postpetition rents which are disputed by the Debtors.  Specifically, the Debtors have asserted and continue to assert a dispute regarding the proper amount of rent due and owing each month under the Lease arising from a dispute relating to the applicable rental versus usable square footage under the Lease. The Debtors have paid rent in an amount which the Debtors believe is proper, but is less than the amount to which the Landlord asserts that it is entitled.  To the extent the Landlord asserts an Administrative Claim for the difference between these amounts, the Debtors expect that the Administrative Claim asserted will be in the amount of approximately $45,000 to $50,000.

Cure Claims.   The Debtors estimate that there will be approximately $750,000 in Allowed Cure Claims for executory contracts assumed and assigned under the Joint Plan.

Professionals' Administrative Claims.  The Debtors estimate that as of the Effective Date, the total Allowed Administrative Claims for the Debtors' professionals will be approximately $475,000.

Priority Tax Claims.  Claims in the approximate amount of $1.8 million have been filed by the New York State Department of Taxation and Finance for the excise taxes assessed under Section 186 of Article 9 of NYS Tax Law.  However, each of these Claims is based not on actual, but only jeopardy assessments of the New York Excise Tax on telecommunication services, and Debtors anticipate that after meetings with the relevant state authorities and/or appeals that this claim will be substantially reduced if not eliminated because the Debtors are resellers and thus excluded from such taxes under Section 186-e.2(b)(1) of Article 9 of NYS Tax Law.   The Debtors have already undertaken this analysis and through their CPA, have commenced this resolution process.  In addition to the above, there are approximately $900 in other asserted Priority Tax Claims.

**C.    Disconnection Dispute.**

Debtors are incurring in excess of $100,000 per month in charges relating to circuits used by the Carrier Services business segment which the Debtor ceased operating in November 2010. Through February 7, 2011, these charges exceed $300,000.

The Debtors dispute these charges.  However, the vendors who continue to bill the Company are vendors who also provide other essential services to the Debtors and will be critical to the Reorganized Debtor's future success.  The Debtors are attempting to negotiate with these vendors to obtain reversal of these charges.  However, failure to achieve a consensual resolution might result in increased Administrative Claims, which while disputable, could have a negative impact upon the Debtors' plans for emergence.

Most of these billings are the result of AT&T's refusal to acknowledge the Rejection Order and thereby disconnect its circuits.  While every Carrier other than AT&T promptly disconnected its circuits in compliance with the Rejection Order, AT&T has yet to issue notices of rejection and continues to state that the issue is "under review" in its legal department.  As a result, these charges continue to accrue.  The Debtors likely have affirmative claims against AT&T as a result of AT&T's conduct, and the full extent of damages is not yet known.

17

# V.
## SUMMARY OF THE PLAN

The following is a general overview of the provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VII hereof and the Plan. The primary objective of a restructuring is to maximize returns to creditors and it is Debtors' desire to obtain this objective through a reorganization of the Debtors around Debtors' Hosted Services segment as set forth in the Joint Plan. Under the Joint Plan, the Reorganized Debtor will continue operating as a going-concern and seek to reorganize around the Hosted Services segment of Debtors' business.

### A.    Summary of the Joint Plan.

Since the Petition Date, Debtors have engaged in an aggressive campaign to solicit the interest of potential purchasers in a sale of all or parts of its business. Given the somewhat specialized nature of the Debtors' business, the Debtors focused their marketing efforts on parties already in the telecommunications industry. The Debtors' marketing efforts resulted in expressions of interest from approximately seventeen (17) different parties, fifteen (15) of which executed non-disclosure agreements with the Debtors to conduct due diligence regarding a potential purchase, and which resulted in a handful of firm offers for its business. The Debtors also had discussions with various constituencies in their Reorganization Case--including both major unsecured creditors and shareholders--in order to fully explore and to properly vet all potential parties that may be interested in its business. As a result of the foregoing efforts, the Debtors believe that they have exercised commercially reasonable best efforts under the circumstances to market their assets for sale to potential purchasers.

Debtors originally sought to sell both their Carrier Services and the Hosted Services business segments. On November 4, 2010, the Bankruptcy Court entered an Order: (i) Approving Procedures for the Sale of Debtors' Carrier Services Assets, (ii) Scheduling a Final Hearing Approving the Sale of the Carrier Services Assets, and (iii) Approving the Form and Manner of Notice Thereof, thereby approving procedures for the sale of the Carrier Services segment. Subsequently, the Carrier Services Sale closed and the proceeds of $578,720 were transferred to the Debtors.

On September 23, 2010, the Debtors executed that certain Asset Purchase Agreement ("Purchase Agreement") with the Stalking Horse Bidder for the purchase and sale of the Hosted Services segment, and the Debtors thereafter filed their Motion for Order: (i) Approving Procedures for the Sale of Debtors' Hosted Services Assets, (ii) Authorizing the Sale of the Hosted Services Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (iv) Granting Related Relief. However, the Majority Equity Holders objected to the sale of the Hosted Services segment pursuant to the Motion and the Bankruptcy Court denied the requested relief, ruling that if the Hosted Services Assets are to be sold, the sale must occur through a plan of reorganization. Therefore, the Debtors negotiated a revised asset purchase agreement with the Stalking Horse Bidder and intended to propose a sale pursuant to the revised asset purchase agreement through a plan of reorganization. Ultimately, however, the Debtors and the Stalking Horse Bidder would unable to reach an agreement regarding the terms of the revised asset purchase agreement.

18

The Joint Plan seeks to reorganize Debtors around the Hosted Services segment of Debtors' business. In order to accomplish reorganization, the Majority Equity Holders will contribute $2.5 million in capital, allowing interested Equity Holders an opportunity to contribute funds on a prorated basis in order to preserve their Equity Interests in the Reorganized Debtor. The Debtors and the Majority Equity Holders believe that with the sale of the Carrier Services segment, the business of the Reorganized Debtor will succeed. Specifically, the VoIP Litigation based on the Carrier Services segment was the driving force behind Debtors' financial problems and ultimately, the filing of the voluntary bankruptcy petitions. Further, the Carrier Services segment operated in a highly competitive market, and beginning in March 2010, the Carrier Services segment began experiencing a sharp reduction in traffic, thereby significantly reducing monthly revenue. With the elimination of the Carrier Services segment of the Debtors' business and continued operation of the more profitable Hosted Services segment, the Debtors and Majority Equity Holders believe that the Reorganized Debtor will be able to operate profitably following reorganization.

Generally, the Joint Plan provides for payment of Allowed Claims from cash on hand, collected accounts receivable, net proceeds from the sale of the Carrier Services segment, $2.5 million in additional capital contributions by the holders of Equity Interests (the "New Payment Equity") and Note Distributions totaling $2.5 million. The Note Distributions will be paid from the proceeds of a Note issued to pay Allowed Claims. The Note Distributions will consist of $800,000 payable in 2011 and $1,700,000 payable in 2012, which sums are to be derived from the operations of the Reorganized Debtor. The Debtors and Majority Equity Holders estimate the total amount to be available to holders of Allowed Administrative Claims and Allowed Unsecured Creditors to be $7,277,500.

The amount of New Payment Equity was determined based upon an estimation of the value of the Hosted Services segment from business experience and familiarity with Debtors' operations and a desire to provide an ultimate distribution to creditors that would exceed the $4 million offer to purchase the Hosted Services segment by KeyOn Communications, Inc. ("KeyOn"). The Majority Equity Holders viewed the $4 million offer to purchase as the ceiling on value based upon the marketing efforts by the Debtors.

Based upon events that have transpired since October 8, 2010, the Majority Equity Holders contend that the New Payment Equity is in fact an accurate reflection of the value of the Hosted Services segment of the Debtors' business for a number of reasons, including the following: (1) exclusivity expired on October 11, 2010, thereby providing Paetec, Verizon, AT&T or any other creditors of the Debtors the opportunity to file a competing plan; and (2) the sale of the assets of the Debtors were, in fact, subjected to market testing prior to the filing of the Disclosure Statement and proposed Plan of Reorganization.

Regarding expiration of exclusivity and the existence of a competitive environment, Debtors filed for Chapter 11 bankruptcy protection on June 13, 2010. Pursuant to 11 U.S.C. § 1121, the Debtors' exclusivity period expired on October 11, 2010. The Debtors did not move to extend the exclusivity period. The Proponents did not file their proposed Disclosure Statement and Joint Plan of Reorganization until December 10, 2010, two months after expiration of exclusivity. Paetec, Verizon, AT&T and any other creditors or parties-in-interest had the opportunity to file their own plan of reorganization had they desired to do so. No competing plans were filed in the Bankruptcy Case.

19

Regarding competitive bidding as a component of market testing, the Debtors attempted to sell the assets of the business prior to the filing of the disclosure statement and proposed plan. The value of the assets was initially set based upon Debtors' efforts to sell the Hosted Services segment to outside third parties. The supportive facts are set forth in the <u>Declaration of Gregory Roeper in Support of Motion for order (I) Approving Procedures for the Sale of the Debtors' Hosted Services Assets, (II) Authorizing the Sales Free and Clear of All Liens, Claims, Interest and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief</u> (the "<u>Roeper Declaration</u>") (ECF No. 254) filed with the Court on October 8, 2010.

Gregory Roeper attests that since the Petition Date, the Debtors "engaged in an aggressive campaign to solicit the interest of potential purchasers in a sale of all or parts of its business." Roeper Declaration, pg. 2, ll. 11-12. Mr. Roeper goes on to say that:

> [T]he Debtors focused their marketing efforts on parties already in the telecommunication industry. The Debtors' marketing efforts resulted in expressions of interest from approximately seventeen (17) different parties, fifteen (15) of which executed non-disclosure agreements with the Debtors to conduct due diligence regarding a potential purchase, and which resulted in a handful of firm offers for its business. The Debtors also had discussions with various constituencies in its Chapter 11 Cases – including both major unsecured creditors and shareholders—in order to fully explore and to properly vet all potential parties that may be interested in its business. As a result of the foregoing efforts, the Debtors believe that they have exercised commercially reasonable best efforts under the circumstances to market their assets for sale to potential purchasers.

<u>See</u> Roeper Declaration pg. 2, ll. 13-22.

The only objection to the Debtors' efforts to sell the Hosted Services segment was filed by the Majority Equity Holders on the grounds that the sale of the Hosted Services segment must occur in the confines of a plan of reorganization, rather than pursuant to a section 363 sale. No creditor or party-in-interest challenged in any way the adequacy or sufficiency of the Debtors' marketing efforts or voiced any concerns whatsoever regarding the proposed sale price.

Following oral argument at the hearing on October 25, 2010, the Court denied the Debtors' motion to sell the Hosted Services segment without prejudice and ordered that any such sale occur within the confines of a proposed Chapter 11 plan. <u>See Order Denying Without Prejudice Debtors' Motion for Order Approving Procedures for the Sale of Debtors' Hosted Services Assets, and Relief Related Thereof</u> (ECF No. 322). Following the denial of the sale of the Hosted Services segment, KeyOn withdrew its purchase offer. Since that time, the Debtors have not received any other offers to purchase the Hosted Services segment.

The Debtors and Majority Equity Holders anticipate that the Reorganized Debtor will continue to operate under Debtors' current management. However, no agreements have been reached between Debtors' current management and the Majority Equity Holders regarding the terms of any employment agreement. The Debtors and Majority Equity Holders anticipate preparing written employment agreements, which will be submitted to the Court as exhibits to the Proposed Plan prior to the Confirmation Hearing.

## B.     Claim Classification and Treatment in the Plan.

The Classification of the Claims asserted against the Debtors under the Plan are summarized in the following table:

| Class | Description | Treatment under Joint Plan | Approximate Amount of Claims Asserted[9] |
|-------|-------------|----------------------------|-------------------------------------------|
| Class 1: | Other Priority Claims | Unimpaired | $0 |
| Class 2: | General Unsecured Convenience Claims | Impaired | $13,000 |
| Class 3: | General Unsecured Non-Carrier Claims | Impaired | $1,250,000 [10] |
| Class 4: | General Unsecured Carrier Claims | Impaired | $28,800,000 |
| Class 5: | Penalty Claims | Impaired | $0 |
| Class 6: | Equity Interests | Impaired | $64,651,175 |
| Class 7 | Open Class | | |

The distinction between non-carrier and carrier claims is significant. The Class 4 Carrier Claims consist of all Claims of carriers which the Debtors believe relate to the VoIP Litigation discussed in detail in this Disclosure Statement, which are disputed to the extent that they are based on VoIP-originated traffic, and other Claims of carriers which are based on TDM-originated traffic and therefore not disputed on the basis of the 1996 Act. Debtors and the Majority Equity Holders anticipate that the Debtor will be successful in the VoIP Litigation and that the disputed portion of these Class 4 Claims will be eliminated, thereby dramatically increasing the distribution under the Plan to the remaining Unsecured Claims. Under the Joint Plan, Equity Holders will receive an interest based upon the New Equity Payment regardless of whether the VoIP Litigation is successful. The Claims classified in Class 3 consist of all General Unsecured Claims of the Debtors other than the General Unsecured Convenience Claims and the Carrier Claims.

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims[11] and Allowed Priority Tax Claims[12] are not designated within any Class under the Plan. The holders

---

[9] Including all Claims asserted without distinguishing between Allowed Claims and Disputed Claims.

[10] As set forth above, the Debtors anticipate that a Claim for leases rejection damages in the amount of approximately $540,000 will be filed subsequent to this Disclosure Statement, which, if filed, will increase the amount of general unsecured claims to approximately $1.8 million.

[11] Debtors' estimated Allowed Administrative Claims for Debtors' Professionals' fees from the Petition Date through the projected Confirmation Date are estimated to be $475,000.

[12] Collectively, Debtor's schedules and filed proofs of Claim reflect Priority Tax Claims in the approximate sum of $1,800,000.

21

of Allowed Administrative Claims and Allowed Priority Tax Claims shall be paid in full under the Plan, consistent with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code, and are not entitled to vote on the Plan.

The holders of Allowed Class 1 Other Priority Claims will receive cash equal to the Allowed amount of such Claim on the later of (i) the Effective Date, (ii) the fourteenth (14th) day after the date on which an order allowing such Claim becomes a Final Order; or (iii) such other time as is agreed to by the holder of such Claim and Debtors prior to the Effective Date or the Reorganized Debtor after the Effective Date.

Class 2 General Unsecured Convenience Claims will be paid in full the first Business Day which is thirty (30) days after the later of the Effective Date or such other date as agreed to between the holder of such Claim and the Debtors, if before the Effective Date, or the Reorganized Debtors, if after the Effective Date.

Holders of Allowed Class 3 Claims, Class 4 Claims, and Class 5 Claims will receive distributions from the following sources: (i) cash on hand referred to as Effective Date Cash, (ii) collected accounts receivable referred to as Effective Date Accounts Receivable, (iii) net proceeds from the Carrier Services segment sale; (iv) the New Equity Payment (less CapX Reserve) of at least $2.5 million and (v) Note Distributions totaling $2.5 million. Distributions to holders of Allowed Class 3, Class 4, and Class 5 Claims will not be made until the later of (i) fourteen (14) days after the Claim becomes an Allowed Claim, or (ii) the date which is no more than sixty (60) days after the allowance or disallowance of the Claims of Carrier Claimants arising out of VoIP Litigation by Final Order of the Bankruptcy Court. Because each of the Claims in Classes 3, 4, and 5 are General Unsecured Claims, they will share Pro Rata in the Distributions. The final Distribution will not take place until all Disputed Claims and Disputed Equity Interests, including the VoIP Litigation, is fully resolved.

Under the Joint Plan, Class 6 Equity Interests shall be cancelled on the Effective Date and the holders of the Equity Interests will be given the option to purchase stock in the Reorganized Debtor at $0.10 per share as follows: On the Effective Date, all outstanding shares of common stock or preferred stock (including, without limitation, Series A Preferred Stock and Series B Preferred Stock) in the Debtor that were issued prior to confirmation of the Joint Plan (collectively, the "Old Stock") shall be cancelled and, without further order of the Bankruptcy Court or need for corporate approval: (i) the Reorganized Debtor shall amend and restate its Articles of Incorporation and such other constituent documents (collectively, the "Amended Articles and Constituent Documents") as may be necessary or appropriate to authorize the issuance of 50,000,000 shares of common stock (the "New Common Stock"); and (ii) the Reorganized Debtor shall issue the New Common Stock as provided for in the Plan.

**VI.**
**SUMMARY OF VOTING PROCESS**

**A.**    **Who May Vote to Accept or Reject the Plan.**

Generally, holders of allowed claims or equity interests that are "impaired" under a plan are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor; an equity security represents an ownership stake in a debtor. In order to vote, a creditor must first have an allowed claim. The solicitation of votes on the Plan will be sought only from those holders of Allowed Claims whose Claims are impaired and which will receive property or rights under the Plan. As explained more fully below, to be

22

entitled to vote, a Claim must be both "Allowed" and "Impaired." Similarly, in order to vote, the holder of an equity interest must first have an allowed equity interest, must be impaired, and must receive property or rights under the plan.

**B.      Summary of Voting Requirements.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims. A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan, excluding the votes of insiders. A class of equity interests has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity interests of the class actually voting cast votes in favor of a plan. Debtors are soliciting votes from holders of Allowed Claims in the following classes which are impaired under the Plan:

| Class | Description | Treatment Under Plan |
|-------|-------------|---------------------|
| Class 2: | General Unsecured Convenience Claims | Impaired, entitled to vote |
| Class 3: | General Unsecured Non-Carrier Claims | Impaired, entitled to vote |
| Class 4: | General Unsecured Carrier Claims | Impaired, entitled to vote |
| Class 5 | Penalty Claims | Impaired, entitled to vote |
| Class 6: | Equity Interests | Impaired, entitled to vote |

Debtors and Majority Equity Holders will have the right to supplement this Disclosure Statement as to additional impaired Classes, if any. The treatment of each Class is described in the Plan and is summarized generally in Articles IV and VII of this Disclosure Statement.

A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. DEBTORS BELIEVE THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS A BETTER ALTERNATIVE THAN LIQUIDATION OF THE DEBTORS' ASSETS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS AND EQUITY INTERESTS VOTE IN FAVOR OF THE PLAN.

**VII.**
**DESCRIPTION OF THE PLAN**

**A.      Overview Of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Besides permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly-situated creditors and similarly-situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

23

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan, and any creditor of, or equity holder in, the debtor, regardless of whether such creditor or equity holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under Section 1122 of the Bankruptcy Code to classify Claims and Equity Interests into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such respective Classes. The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a holder of a Claim or Equity Interest will challenge the Plan's classifications and that the Bankruptcy Court will find that different classifications are required in order for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court, to make reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting holders are ultimately deemed members. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The Debtors (and their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of securities under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The Debtors or Reorganized Debtor will make all payments and other distributions under the Plan which is confirmed, unless otherwise specified.

**B.    Treatment of Unclassified Claims Under the Plan.**

**1.    Treatment Of Administrative Claims.**

Except to the extent that any entity entitled to payment of any Allowed Administrative Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Claim will receive Cash in an amount equal to such Allowed Administrative Claim upon the latest of: (i) the Effective Date; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon

24

thereafter as practicable; and (iv) such date as the holder of such Claim and, prior to the Effective Date, Debtors, and after the Effective Date, Reorganized Debtor, shall agree upon; provided, however, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession, or non-ordinary course liabilities approved by the Bankruptcy Court, will be paid in full and performed by the Reorganized Debtor in the ordinary course of its business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements, governing instruments evidencing, or other documents relating to such transactions. For the avoidance of doubt, nothing in this paragraph shall be construed in a manner that is inconsistent with the Notice of Bar Date, discussed below.

**Administrative Claim Bar Date**. Excluding (i) professional fee claims, (ii) claims relating to the assumption and cure of an executory contract, and (iii) U.S. Trustee fees, the deadline for filing of requests for allowance of claims arising under Bankruptcy Code section 503(b) or 507(b) shall be **March 21, 2011**, pursuant to the Notice of Bar Date.

Any such request for allowance must include all expenses incurred prior to the date of such request, and a good faith estimate of all administrative expense claims, if any, that will arise or accrue from the Bar Date through the commencement of the confirmation hearing on April 26, 2011 on the Plan. Any such request for allowance must be in writing, specify the name and address of the Claimant, set forth the amount of the Claimant's Administrative Claim(s), explain the nature of Claimant's Administrative Claim(s) and be accompanied by evidentiary support for the Administrative Claim(s), including declarations made under penalty of perjury and other admissible documentary evidence.

Objections to Administrative Claims shall be filed no later than **March 28, 2011**. Responses to such objections shall be filed no later than **April 8, 2011**. Replies shall be filed no later than **April 15, 2011**. The Bankruptcy Court will hold a pretrial conference in connection with the Plan and the estimation of Administrative Claims for the purpose of confirmation of the Plan on **April 19, 2011** at **10:30 a.m.** A joint pretrial statement shall be filed no later than **April 18, 2011**. The Bar Date Notice accompanies this Disclosure Statement.

The Bar Date for Administrative Claims which arise or accrue subsequent to March 21, 2011 shall be the end of the first Business Day occurring on or after the twentieth (20th) day after the Confirmation Date. Any such request for allowance must be in writing, specify the name and address of the Claimant, set forth the amount of the Claimant's Administrative Claim(s) explain the nature of Claimant's Administrative Claim(s), and be accompanied by evidentiary support for the Administrative Claim(s), including declarations made under penalty of perjury and other admissible documentary evidence. Any such request for allowance must be served upon counsel for the Debtors, the Majority Equity Holders, the U.S. Trustee, and the Special Notice Parties

2.    **Treatment Of Priority Tax Claims.**

To the extent of available Cash, the holder of every Allowed Priority Tax Claim will be paid in full satisfaction of such Claim pursuant to the provisions of Bankruptcy Code § 1129(a)(9)(C): (a) in deferred Cash payments over a period of five (5) years from the Petition Date, to be paid in equal quarterly installments of principal and interest with: (i) the first payment to be made on the first Business Day after the day which is ninety (90) days after the

25

later of the Effective Date or the Claim Payment Date; and (ii) each payment thereafter to be paid on the first Business Day of each succeeding quarter until paid in full; provided, however, that the entire unpaid amount of the Allowed Priority Tax Claim, together with any interest accrued thereon, will be paid in full on the date which is five (5) years after the Petition Date or as otherwise agreed in writing by the holder of the Allowed Claim or ordered by the Bankruptcy Court. Notwithstanding the above, Debtors are authorized to pay and anticipate paying Allowed Priority Tax Claims in full on the later of (i) the Effective Date, (ii) the fourteenth (14th) Business Day after the date on which an order allowing such Claim becomes a Final Order; or (iii) such other time as is agreed to by the holder of such Claim and Debtors prior to the Effective Date or the Reorganized Debtor after the Effective Date.

**C.**    **Classification and Treatment of Claims and Equity Securities Under the Plan.**

    1.    **Treatment of Class 1 (Other Priority Claims).**

Class 1 consists of Other Priority Claims. Holders of Allowed Class 1 Other Priority Claims will be paid in full, with interest, in full satisfaction of such Claim, by a single cash payment in the Allowed amount of such Claim on the later of (i) the Effective Date, (ii) the fourteenth (14th) Business Day after the date on which an order allowing such Claim becomes a Final Order; or (iii) such other time as is agreed to by the holder of such Claim and Debtors prior to the Effective Date or the Reorganized Debtor after the Effective Date. Debtors and the Majority Equity Holders do not believe there are any Allowed Class 1 Claims.

Creditors in Class 1 are unimpaired, are deemed to have accepted the Plan, and are not entitled to vote on the Plan.

    2.    **Treatment of Class 2 (General Unsecured Convenience Claims).**

Class 2 General Unsecured Convenience Claim will be paid the amount of their Allowed Claims, without interest. To the extent of available Cash, the Allowed Class 2 Claims will be paid on the later of (i) the Effective Date, and (ii) such other time as is agreed to by the holder of such Claim and Debtors prior to the Effective Date or the Reorganized Debtor after the Effective Date.

Creditors in Class 2 are impaired and are entitled to vote.

    3.    **Treatment of Class 3 (General Unsecured Non-Carrier Claims).**

Every Creditor holding an Allowed Class 3 General Unsecured Non-Carrier Claim will receive distributions from the following sources: (i) cash on hand referred to as Effective Date Cash, (ii) collected accounts receivable referred to as Effective Date Accounts Receivable, (iii) net proceeds from the Carrier Segment sale; (iv) the New Equity Payment (less CapX Reserve) of at least $2.5 million and (v) Note Distributions totaling $2.5 million. Distributions to holders of Allowed Class 3 General Unsecured Non-Carrier Claims will not be made until the later of (i) fourteen (14) days after the Claim becomes an Allowed Claim, or (ii) the date which is no more than sixty (60) days after the allowance or disallowance of the Claims of Carrier Claimants arising out of VoIP Litigation by Final Order of the Bankruptcy Court. To the extent such a Final Order is entered before collection of Effective Date Accounts Receivable, the remaining Effective Date Accounts Receivable will be distributed quarterly, as collected, on a prorate basis on par with Allowed Class 4 and Allowed Class 5 Claims. To the extent such a Final Order is entered before Distributions are required under the Note, remaining Note Distributions will be made pursuant to the terms of the Note on a pro rata basis on par with Allowed Class 4 and Allowed Class 5 Claims.

Allowed Class 3 claims will receive a pro rata distribution on par with Allowed Class 4 Carrier Claims and Allowed Class 5 Claims after Initial Distributions which shall consist of payment in full of allowed Administrative Claims, Allowed Priority Claims, Allowed Class 1 Claims and General Unsecured Convenience Claims.

### 4. **Treatment of Class 4 (General Unsecured Carrier Claims).**

Every Creditor holding an Allowed Class 4 General Unsecured Carrier Claim will receive distributions from the following sources: (i) cash on hand referred to as Effective Date Cash, (ii) collected accounts receivable referred to as Effective Date Accounts Receivable, (iii) net proceeds from the Carrier Segment sale; (iv) the New Equity Payment (less CapX Reserve) of at least $2.5 million and (v) Note Distributions totaling $2.5 million. Distributions to holders of Allowed Class 4 General Unsecured Carrier Claims will not be made until the later of (i) fourteen (14) days after the Claim becomes an Allowed Claim, or (ii) the date which is no more than sixty (60) days after the allowance or disallowance of the Claims of Carrier Claimants arising out of VoIP Litigation by Final Order of the Bankruptcy Court. To the extent such a Final Order is entered before collection of Effective Date Accounts Receivable, the remaining Effective Date Accounts Receivable will be distributed quarterly, as collected, on a prorate basis on par with Allowed Class 3 and Allowed Class 5 Claims. To the extent such a Final Order is entered before Distributions are required under the Note, remaining Note Distributions will be made pursuant to the terms of the Note on a pro rata basis on par with Allowed Class 3 and Allowed Class 5 Claims. Allowed Class 4 claims will receive a pro rata distribution on par with Allowed Class 3 Non-Carrier Claims and Allowed Class 5 Claims after Initial Distributions which shall consist of payment in full of Allowed Administrative Claims, Allowed Priority Claims, Allowed Class 1 Claims and General Unsecured Convenience Claims.

Class 4 Claims are impaired and entitled to vote under the Joint Plan.

### 5. **Treatment of Class 5 (Penalty Claims).**

Every Creditor holding an Allowed Class 5 Claim will receive distributions from the following sources: (i) cash on hand referred to as Effective Date Cash, (ii) collected accounts receivable referred to as Effective Date Accounts Receivable, (iii) net proceeds from the Carrier Segment sale; (iv) the New Equity Payment (less CapX Reserve) of at least $2.5 million and (v) Note Distributions totaling $2.5 million. Distributions to holders of Allowed Class 5 General Unsecured Carrier Claims will not be made until the later of (i) fourteen (14) days after the Claim becomes an Allowed Claim, or (ii) the date which is no more than sixty (60) days after the allowance or disallowance of the Claims of Carrier Claimants arising out of VoIP Litigation by Final Order of the Bankruptcy Court. To the extent such a Final Order is entered before collection of Effective Date Accounts Receivable, the remaining Effective Date Accounts Receivable will be distributed quarterly, as collected, on a prorate basis on par with Allowed Class 3 and Allowed Class 4 Claims. To the extent such a Final Order is entered before Distributions are required under the Note, remaining Note Distributions will be made pursuant to the terms of the Note on a pro rata basis on par with Allowed Class 3 and Allowed Class 4 Claims. Allowed Class 5 claims will receive a pro rata distribution on par with Allowed Class 3 Non-Carrier Claims and Allowed Class 4 Claims after Initial Distributions which shall consist of payment in full of allowed Administrative Claims, Allowed Priority Claims, Allowed Class 1 Claims and General Unsecured Convenience Claims.

Creditors under Class 5 are impaired and entitled to vote on the Joint Plan. The Debtors and the Majority Equity Holders do not believe there are any Class 5 Claims.

27

6.    **Treatment Of Class 6 (Equity Interests).**

On the Effective Date, all outstanding shares Old Stock, consisting of common stock and preferred stock (including, without limitation, Series A Preferred Stock and Series B Preferred Stock) in the Debtor that were issued prior to confirmation of the Plan, shall be cancelled and, without further order of the Bankruptcy Court or need for corporate approval: (i) the Debtor shall amend and restate its Articles of Incorporation and such other constituent documents (collectively, the "Amended Articles and Constituent Documents") as may be necessary or appropriate to authorize the issuance the New Common Stock, consisting of 50,000,000 shares of common stock; and (ii) the Reorganized Debtor will issue the New Common Stock as provided for in the Plan.

Creditors with Class 6 Equity Interests are Impaired under the Joint Plan and are entitled to vote on the Joint Plan.

D.    **Means of Implementation of The Plan.**

1.    **Continued Existence and Vesting of Assets in Reorganized Debtor.**

Subject to the Plan Documents, the Debtor will continue to exist after the Effective Date as a separate legal entity, with all the powers available to such entity under applicable Nevada law and pursuant to its certificate of incorporation and by-laws or other organizational documents in effect prior to the Effective Date as such may be amended by the Joint Plan or any Plan Document, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

On the Effective Date, the Old Stock will be cancelled and, without further order of the Bankruptcy Court or need for corporate approval: (i) the Reorganized Debtor will execute the Amended Articles and Constituent Documents as may be necessary or appropriate to authorize the issuance of the New Common Stock; and (ii) the Reorganized Debtor will issue the New Common Stock as provided for in the Joint Plan.    The Amended Articles and Constituent Documents will supersede all other articles of incorporation, bylaws or other constituent documents in respect of the Debtors, without further order of the Bankruptcy Court or need for corporate approval, and shall be binding on the holders of New Common Stock.    In the event of a conflict between the Plan and the Amended Articles and Constituent Documents, the terms of the Amended Articles and Constituent Documents shall govern.

The New Common Stock shall be issued as follows: each holder of an Allowed Equity Interest shall be eligible to purchase one (1) or more shares of New Common Stock for an amount equal to $0.10 per share (the "New Stock Purchase Price").    The New Stock Purchase Price shall be paid by each holder of an Allowed Equity Interest into an escrow account (the "Escrow Account") established to facilitate the issuance of the New Common Stock on or before the Effective Date.    Each holder of an Allowed Equity Interest electing to purchase New Common Stock, at the time of depositing the New Stock Purchase Price into the Escrow Account, shall also designate in writing to the Majority Equity Holders the number of shares of New Common Stock such holder of an Allowed Equity Interest is electing to purchase and the total New Stock Purchase Price being deposited into the Escrow Account.    On the Effective Date, all funds held in the Escrow Account shall be transferred into one or more bank accounts in the name of the Reorganized Debtor that may be designated by the Reorganized Debtor and share certificates evidencing the New Common Stock purchased by any holder of an Allowed Equity Interest by payment of the New Stock Purchase Price shall be issued by the Reorganized

28

Debtor. The Majority Equity Holders have committed to purchase up to 25,000,0000 shares of New Common Stock for a New Stock Purchase Price of up to $2,500,000; provided, however, this commitment shall be reduced by each share of New Common Stock purchased by any holder of an Allowed Equity Interest that is not a Majority Equity Holder.

Pursuant to section 1145(a) of the Bankruptcy Code, section 5 of the Securities Act of 1933 and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security shall not apply to the issuance of the New Common Stock. In addition, pursuant to section 1125(e) of the Bankruptcy Code, any Persons that solicit the acceptance or rejection of the Joint Plan, in good faith and in compliance with the Bankruptcy Code, or that participate, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale or purchase of a security, offered or sold under the Joint Plan, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities.

The entry of the Confirmation Order shall constitute authorization for the Debtors or the Reorganized Debtor, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule, or regulation, including, without limitation, any action required by holders of common stock or preferred stock (including, without limitation, Series A Preferred Stock and Series B Preferred Stock) in the Debtors that were issued prior to confirmation of the Plan, including, among other things, the issuance of the New Common Stock and the adoption of the Amended Articles and Constituent Documents under the Joint Plan.

Except as otherwise provided in the Joint Plan or the Plan Documents, on and after the Effective Date, all property of the Estate and any property acquired by the Debtors or the Reorganized Debtor under the Joint Plan will vest in the Reorganized Debtor in accordance with Section 17.2 of the Joint Plan. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims or Equity Interests, without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan, the Amended and Restated Articles of Incorporation and bylaws, or the Confirmation Order.

2.    **Management of Reorganized Debtor.**

From and after the Effective Date, the Reorganized Debtor will continue to be managed by current management of the Debtor subject in all respects to the terms and conditions of the Amended Articles and Plan Documents. It is anticipated that management will consist of following individuals: Mr. David S. Clark as CEO, Mr. Gregory K. Roeper as President, Mr. Mark Peterson as Executive Vice President, Marketing, and Mr. Paul Mona as Vice President, Engineering. The Majority Equity Holders do not currently have any agreements with the Debtors' officers or other management to continue their employment with the Reorganized Debtor in the event the Joint Plan is confirmed. However, the Debtors and Majority Equity Holders anticipate preparing written employment agreements, which will be submitted to the Court as exhibits to the Proposed Plan prior to the Confirmation Hearing.

102498-002/1140438_3.doc

3. **Funding on the Effective Date and Initial Distribution.**

All payments under the Joint Plan to be made on the Effective Date and the Initial Distribution, will be funded from cash on hand (Effective Date Cash), collected accounts receivable (Effective Date Accounts Receivable); proceeds from the sale of the Carrier Segment; and New Equity Payment in the minimum amount of $2.5 million (less the CapX Reserve).

4. **Funding After the Effective Date.**

The funds necessary to ensure continuing performance under the Joint Plan after the Effective Date will be (or may be) obtained from:

        (i)     Collection of Effective Date Accounts Receivable;

        (ii)    Cash generated from the post-Effective Date operations of the Reorganized Debtor and pursuant to the Note;

        (iii)   Any reserves established by the Debtor or the Reorganized Debtor; and

        (iv)   Any other contributions or financing (if any) which the Reorganized Debtor may obtain on or after the Effective Date.

5. **Procedure for Determination of Claims.**

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date, the Reorganized Debtor may object to the allowance of any Claim against the Debtors or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing the appropriate pleading in the Bankruptcy Court at any time prior to the first Business Day which is sixty (60) days after the Effective Date.

No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order. If a Claim is not an Allowed Claim by or on the Effective Date or when payment is otherwise due under the Plan, payment on the Allowed Claim (plus interest, if any, is payable under the Plan) will commence when a Claim becomes an Allowed Claim after the Effective Date.

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan. The holder of a Contingent Claim will only be entitled to a distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim.

6. **Setoffs.**

Except as otherwise provided in the Joint Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtors and the Reorganized Debtor may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, offset against any Claim or Equity Interest and any distribution to be made on account of such Claim or Equity Interest, any and all of the Claims, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtor may hold against the holder of such Claim or Equity Interest; provided, however, that neither the failure to effect such a Setoff, the allowance of any Claim or Equity Interest hereunder, any other action or omission of the Debtors or the Reorganized Debtor, nor any provision of the Joint Plan will constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtor of any such Claims, rights and Causes of Action that the

30

Debtors or the Reorganized Debtor may possess against such holder.  To the extent the Debtors or the Reorganized Debtor fails to effect such a Setoff against a holder and seek to collect a Claim from such holder after a distribution to such holder pursuant to the Joint Plan, the Reorganized Debtor will be entitled to full recovery on its Claim against such Creditor.

### 7.    Payments Effective Upon Tender.

Whenever the Joint Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Debtors or the Reorganized Debtor to the Creditor to whom payment is due.  If any Creditor refuses a tender, the amount tendered and refused will be held by the Debtors or the Reorganized Debtor for the benefit of that Creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Joint Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor if the Debtors or the Reorganized Debtor failed to pay the tendered payment.

### 8.    Post Effective Date Fees, Costs and Expenses.

After approval by the Bankruptcy Court of the final fee applications of the Chapter 11 Professionals submitted in accordance with Section 3.2 of the Joint Plan for services provided and costs incurred during the course of administration of the Reorganization Case and prior to the Effective Date, the Chapter 11 Professionals will not be required to submit any further fee applications to the Bankruptcy Court.  Any Claims for fees, costs and expenses incurred by any Chapter 11 Professionals after the Effective Date, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan, will be treated as part of the fees and expenses of the Reorganized Debtor and paid in the ordinary course of the business of the Reorganized Debtor, without the necessity for any approval by the Bankruptcy Court.

### 9.    Objections to Administrative Claims, Claims and Equity Interests.

The Debtors and the Reorganized Debtor will be entitled to object to Administrative Claims, Claims, and Equity Interests.  Any objections to Claims or Equity Interests will be filed and served by the later of:  (i) the Claim Objection Deadline and (ii) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.  Any objections to Administrative Claims filed on or before March 21, 2011 will be filed and served by the later of March 28, 2011 or such other date as is ordered by the Court.  All objections will be litigated to Final Order; provided, however, that the Reorganized Debtor will have the authority to file, settle, compromise or withdraw any objections without Bankruptcy Court approval.

### 10.    Valuation Of Collateral.

In the event it becomes necessary to obtain a Court order determining the value of any collateral in connection with establishing the amount of any Claim secured by such collateral, or establishing the value of all or part of the Assets, then the relevant provisions of the Joint Plan will constitute a motion for determination of the value of collateral pursuant to Bankruptcy Code Section 506(a) and/or a motion for valuation in conjunction with the confirmation process, and the Confirmation Order will set forth the Court's determination of the value of the collateral that is the subject of such a motion.

31

11.    **Transactions To Occur Prior To The Effective Date.**

No less than one (1) Business Day prior to the Effective Date, but after entry of the Confirmation Order, the following will occur:

(i)    The Escrow Account will be established to facilitate the collection of the New Stock Purchase Price.

(ii)    The Amended and Restated Articles of Incorporation shall be filed with the Nevada Secretary of State.

(iii)    Amended and Restated bylaws will be prepared by for the Reorganized Debtor.

12.    **Transactions To Occur On The Effective Date.**

On the Effective Date, the following will occur:

(i)    The Equity Interests in the Debtors will be cancelled.

(ii)    The New Common Stock purchased by any holder of an Allowed Equity Interest by payment of the New Stock Purchase Price shall be issued by the Reorganized Debtor.

(iii)    All funds held in the Escrow Account shall be transferred into one or more bank accounts in the name of the Reorganized Debtor that may be designated by the Reorganized Debtor.

(iv)    Share certificates evidencing the New Common Stock purchased by the holder of an Allowed Equity Interest by payment of the New Stock Purchase Price shall be issued by the Reorganized Debtor.

(v)    All acts necessary or appropriate to implement the Plan Documents will occur.

13.    **Return Of Documents If Effective Date Does Not Occur.**

If the Effective Date does not occur, then (i) the documents delivered to the Escrow Agent in accordance with Article 14 of the Joint Plan will be returned to the party delivering the documents to the Escrow Agent, and the documents will have no force and effect, and (ii) all documents and other instruments that would have been amended, restated, modified, replaced or otherwise affected by any of the documents so delivered into escrow, shall remain in full force and effect, and without any loss of priority.

14.    **Notice of Effectiveness.**

When all conditions precedent set forth in Article 13 of the Joint Plan have been met (subject to any waiver as set forth therein) and all of the steps contemplated by Article 14 of Joint Plan have been completed, Reorganized Debtor will file with the Bankruptcy Court and serve upon all Creditors and all potential holders of Administrative Claims known to Reorganized Debtor (whether or not disputed), a Notice of Effective Date of Plan. The Notice of Effective Date of Plan shall include notice of the Administrative Bar Date.

102498-002/1140438_3.doc

### E.    Executory Contracts And Unexpired Leases.

#### 1.    Assumption and Rejection of Executory Contracts.

All executory contracts and unexpired leases that both exist on the Confirmation Date and are set forth on the schedule of assumed executory contracts and unexpired leases attached as Schedule 6.1 to the Joint Plan shall be deemed assumed by Reorganized Debtor. The Debtors or Majority Equity Holders, up to the Effective Date, may modify the schedule of assumed executory contracts, with notice to the non-debtor party to the contract affected by such modification. All executory contracts and unexpired leases not identified on Schedule 6.1 shall be deemed rejected on the Effective Date.

#### 2.    Approval of Assumption or Rejection.

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Bankruptcy Code Section 365(a), of the assumption by Reorganized Debtor of each executory contract and unexpired lease listed on Schedule 6.1, and (ii) approval for Debtors to reject each executory contract and unexpired lease to which any Debtor is a party and which is not listed on Schedule 6.1 and neither assumed, nor rejected by separate order prior to the Effective Date. Upon the Effective Date, each counter party to an executory contract or unexpired lease listed on Schedule 6.1 shall be deemed to have consented to assumption contemplated by Bankruptcy Code Section 365(c)(1)(B), to the extent such consent is necessary for such assumption.

#### 3.    Cure of Defaults.

Reorganized Debtor shall Cure any defaults respecting each executory contract or unexpired lease assumed pursuant to Article 15 of the Joint Plan upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by the Debtors or the Majority Equity Holders, and after the Effective Date, Reorganized Debtor; Reorganized Debtor; or (iii) the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of Reorganized Debtor to provide "adequate assurance of future performance" under the executory contract or unexpired lease assumed pursuant to the Joint Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment or the Cure of a particular executory contract or an unexpired lease.

#### 4.    Post-Petition Date Contracts and Leases.

Executory contracts and unexpired leases entered into and other obligations incurred after the Petition Date by Debtors shall be assumed by Reorganized Debtor as of the Effective Date. Each such executory contract and unexpired lease shall be performed by the Reorganized Debtor in the ordinary course of its business.

#### 5.    Claims Based on Rejection of Executory Contracts.

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract pursuant to the Joint Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection, if such Final Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated under Class 3 of the Plan. Every such Claim which is not timely filed by the deadline stated above will be forever barred,

unenforceable, and discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

## VIII.
## CONDITIONS TO CONFIRMATION OF PLAN

1.    **Conditions To Confirmation.**

a.    the Bankruptcy Court will have approved the Disclosure Statement with respect to the Joint Plan in an order in form and substance acceptable to the Debtors and the Majority Equity Holders; and

b.    the Confirmation Order will be in form and substance acceptable to the Debtors and the Majority Equity Holders.

2.    **Conditions To Effectiveness.**

The following are conditions precedent to occurrence of the Effective Date under the Joint Plan:

a.    the Confirmation Order, in form and substance acceptable to the Debtors and the Majority Equity Holders, will have been entered and will have become a Final Order; *except that* Debtors and the Majority Equity Holders reserve the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal;

b.    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

c.    The Bankruptcy Court in the Confirmation Order shall have approved the retention of jurisdiction provisions in Article 18 of the Joint Plan;

d.    the Plan Documents to be entered into (rather than assumed) by the Reorganized Debtor will have been entered and delivered and all conditions to the effectiveness of each of the Joint Plan Documents have been satisfied;

e.    The Reorganized Debtor shall have executed the Note in accordance with the Plan;

f.    all actions, documents and agreements necessary to implement the Joint Plan will have been effected or executed; and

g.    the Reorganized Debtor will have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary or appropriate to implement the Joint Plan and that are required by law, regulation, or order.

## IX.
## DISTRIBUTIONS UNDER THE PLAN

1.    **No Recourse.**

No recourse shall ever be had, directly or indirectly, against Reorganized Debtor or against any agent, attorney, accountant or other professional for Reorganized Debtor, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking obligation, covenant or agreement whatsoever executed by Reorganized

34

Debtor under the Plan, or by reason of the creation of any indebtedness by Reorganized Debtor under the Plan for any purpose authorized by the Plan, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Reorganized Debtor, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Assets or such part thereof as shall under the terms of any such agreement be liable therefore or shall be evidence only of a right of payment out of the Assets. Notwithstanding any other provision of this Disclosure Statement or the Plan, this provision shall not apply to the obligation of the Reorganized Debtor under the Note executed pursuant to the Plan or to make the Note Distributions in accordance with the Plan.

2.    **Manner of Distributions.**

Any payment of Cash made by the Reorganized Debtor pursuant to the Joint Plan may, at the Reorganized Debtor's option, be made by check drawn on a domestic bank or wire transfer.

3.    **Timing of Distributions.**

In the event that any payment, distribution, or act under the Joint Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

4.    **Maximum Distribution.**

Notwithstanding anything otherwise to the contrary, in no event will a holder of an Allowed Claim or a Equity Interest which has been Allowed be entitled to receive consideration which results in a distribution of greater than payment in full with respect to such Allowed Claim or Equity Interest.

5.    **De Minimis Distributions.**

The Reorganized Debtor will make no distributions of less than $50 to any Creditor holding an Allowed Claim. If a Creditor holding an Allowed Claim does not receive a distribution due to the provisions of this Section on any date on which a distribution is to be made to Creditors in the same Class as the Creditor being entitled to such de minimis payment, then the Claim (so long as it is an Allowed Claim) will remain eligible for distributions on any subsequent distribution date, subject to the provisions of this section.

6.    **Surrender of Instruments.**

Except to the extent evidenced by electronic book entry or as may be otherwise agreed to in writing by the Reorganized Debtor, as a condition to receiving any distribution under the Joint Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Reorganized Debtor or its designee, unless such certificated instrument or note is being reinstated, amended or being left unimpaired under the Joint Plan. Any holder of such instrument or note that is not otherwise excluded from the requirements of the immediately preceding sentence and that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtor or its designee before the first (1st) anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Joint Plan. Any distribution so forfeited will be treated as unclaimed property under Section 12.11.

35

7. **Interest on Claims.**

Unless otherwise provided in instruments that either take effect on the Effective Date or remain unaltered by the Joint Plan, interest on any Allowed Claims that is payable under the Joint Plan will be simple interest and will not be compound interest. In all events, there will be no default interest payable with respect to any Allowed Claims.

8. **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Joint Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

9. **Withholding Taxes on Distributions.**

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law will be deducted from distributions hereunder and no Person will be entitled to any additional distribution as a result of any such withholding. All Persons holding Claims or Equity Interests will be required to provide any information necessary to effect the withholding of such taxes.

10. **Disputed Payment of Allowed Claims or Equity Interest.**

If any dispute arises as to the identity of a holder of an Allowed Claim or Equity Interest who is to receive any distribution, the Reorganized Debtor may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof will be determined by Bankruptcy Court order or by written agreement among the interested parties to such dispute.

11. **Unclaimed Distributions.**

All distributions under the Joint Plan that are unclaimed for a period of one (1) year after distribution thereof (or an attempt to effect such distribution) in accordance with the Joint Plan will be deemed unclaimed property under Bankruptcy Code Section 347(b), and such unclaimed property will be forfeited by any holder of a Claim originally entitled thereto, whereupon all right, title and interest in and to such unclaimed property will immediately and irrevocably be available for future distributions to holders of Allowed Claims or Equity Interests hereunder in accordance with the terms of the Joint Plan, and the holder of the Allowed Claim or Equity Interest previously entitled to such unclaimed property will cease to be entitled thereto and any entitlement of any holder of any Claim or Equity Interest to such distributions will be extinguished and forever barred.

12. **Further Authorization.**

The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Plan.

102498-002/1140438_3.doc

# X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Reorganization Case and Reorganized Debtor from and after the Effective Date as is legally permissible, including jurisdiction for each of the following purposes:

**A.    In General.**

The Bankruptcy Court will retain jurisdiction to determine the allowance and payment of any Claims or Equity Interests upon any objections thereto (or other appropriate proceedings) by the Debtors, by the Reorganized Debtor, or by any other party in interest entitled to proceed in that manner.    As part of such retained jurisdiction, the Bankruptcy Court will continue to determine the allowance of Administrative Claims and any request for payment thereof, including Administrative Claims for Professional Fees.

**B.    Plan Disputes And Enforcement.**

The Bankruptcy Court will retain jurisdiction to determine any dispute which may arise regarding the interpretation of any provision of the Joint Plan. The Bankruptcy Court also will retain jurisdiction to enforce any provisions of the Joint Plan, the Confirmation Order, the Plan Documents and any and all other documents relating to the Joint Plan.  The Bankruptcy Court will also retain jurisdiction over any matter relating to the implementation, effectuation and/or consummation of the Joint Plan as expressly provided in any provision of the Joint Plan.  The Bankruptcy Court will also retain jurisdiction to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person with consummation, implementation or enforcement of any Final Order, the Joint Plan or the Confirmation Order, except as otherwise provided herein.

**C.    Further Orders.**

The Bankruptcy Court will retain jurisdiction to facilitate the performance of the Joint Plan by entering, consistent with the provisions of the Plan, any further necessary or appropriate order regarding enforcement of the Joint Plan and any provision thereof.  In addition, the Bankruptcy Court will retain jurisdiction to facilitate or implement the allowance, disallowance, treatment, cancellation or satisfaction of any Claim or Equity Interests, or any portion thereof, pursuant to the Joint Plan.  The Bankruptcy Court will retain jurisdiction to enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated.

**D.    Governmental Units Or Regulatory Agencies.**

The Bankruptcy Court will retain jurisdiction to adjudicate any dispute or to hear and determine any action taken, proposed, or threatened by any state, federal, or local governmental regulatory agency or unit having or asserting jurisdiction or power over the conduct of the business of the Debtors and/or the Reorganized Debtor.

**E.    Final Decree.**

The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Bankruptcy Case.

102498-002/1140438_3.doc

**F.**    **Appeals.**

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary to effectuate the reorganization of the Debtors.

**G.**    **Executory Contracts.**

The Bankruptcy Court will retain jurisdiction to determine any and all motions regarding assumption or rejection of Executory Contracts and any and all Claims arising therefrom.

**H.**    **Modification.**

The Bankruptcy Court will retain jurisdiction to modify the Joint Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code and Article 16 of the Joint Plan or modify any contract, instrument, release or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order or Reorganized Debtor; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Joint Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code.

**I.**    **Claims.**

The Bankruptcy Court will retain jurisdiction:  (a) to hear and determine any Claim or Cause of Action by or against the Debtors; the Debtors' shareholders, managers, officers, directors, and employees; the Chapter 11 Professionals and the Reorganized Debtor; and (b) to adjudicate any Causes of Action or other proceedings currently pending or otherwise referenced in the Joint Plan, including, but not limited to, any and all "core proceedings" under 28 U.S.C. §157(b) which may be pertinent to the Reorganization Case and which the Debtors or the Reorganized Debtor may deem appropriate to initiate and prosecute before the Court in aid of the implementation of the Joint Plan.

**J.**    **Determination of Tax Liability.**

Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

**XI.**
**REVOCATION AND MODIFICATION OF PLAN**

Alterations, amendments, or modifications of or to the Joint Plan, including, without limitation, to provide for treatment different than that set forth in the Joint Plan with respect to any Class of Claim or the Equity Interest (including impairment of Classes that are unimpaired under the Joint Plan) may be proposed in writing by the Debtors or the Majority Equity Holders at any time prior to the Confirmation Date, provided that the Joint Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code §§ 1122 and 1123, and the Debtors or the Majority Equity Holders, as applicable, will have complied with Bankruptcy Code § 1125. The Joint Plan may be altered, amended, or modified at any time after the Confirmation Date and

38

before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of Bankruptcy Code §§ 1122 and 1123 and the Bankruptcy Court, after notice and a hearing, confirms the Joint Plan, as altered, amended, or modified, under Bankruptcy Code § 1129 and the circumstances warrant such alterations, amendments, or modifications. A holder of a Claim or the Equity Interest that has accepted the Joint Plan will be deemed to have accepted the Joint Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or the Equity Interest of such holder.

The Debtors and the Majority Equity Holders reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors and the Majority Equity Holders revoke or withdraw the Plan prior to the Effective Date, then the Plan will be deemed null and void. In such event, nothing contained in the Plan or in this Disclosure Statement will constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors. None of the filing of the Plan, the Plan Supplement, the Disclosure Statement, any statement or provision contained herein or therein, or the taking of any action with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Equity Interests prior to the Effective Date or with respect to any matter which is pending before or may come before the Bankruptcy Court for determination in the Bankruptcy Case.

## XII.
## RISK FACTORS

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan and the transactions contemplated by the Plan involve the following risks, which should be taken into consideration.

### A.    The Debtors and Majority Equity Holders Have No Duty To Update.

The statements in this Disclosure Statement are made by the Debtors and the Majority Equity Holders as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors and the Majority Equity Holders have no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

### B.    Information Presented Is Based on the Debtors' Books and Records, and Is Unaudited.

While the Debtors and the Majority Equity Holders have endeavored to present information fairly in this Disclosure Statement, there is no assurance that the Debtors' books and records upon which this Disclosure Statement is based are complete and accurate. Not all historical financial information contained herein has been audited.

### C.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain information in this Disclosure Statement, including the Annual Income Statement and Cash Position provided in Exhibit C in support of the Joint Plan, is forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and projections which may differ materially from actual future results. There are uncertainties associated with

39

all assumptions, projections and estimates, and they should not be considered assurances or guarantees of the amount of funds that will be distributed under the Note or the amount of Claims in the various Classes that will be allowed. However, the Debtors and the Majority Equity Holders believe that the projections set forth in the Annual Income Statement and Cash Position are feasible and supported by the Debtors' historical financial data.

**D.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Creditor should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest and the applicable treatment under the Plan.

**E.      No Admissions Made.**

Nothing contained herein shall constitute an admission of any fact or liability by the Debtors, the Majority Equity Holders, or any other party nor shall it be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

**F.      No Waiver of Right to Object or Right to Recover Transfers and Estate Assets.**

A vote for or against the Plan by the holder of a Claim or Equity Interest does not constitute a waiver or release of any claims or rights of the Debtors, the Reorganized Debtor, or the Majority Equity Holders (or any other party in interest) to object to the Claim of such holder of a Claim or Equity Interest, or recover any preferential, fraudulent or other voidable transfer or Estate assets, regardless of whether any claims of the Debtors or its Estate are specifically or generally identified in this Disclosure Statement or the Plan.

**G.      Bankruptcy Law Risks and Considerations.**

    **1.      Confirmation of the Plan Is Not Assured.**

Although the Debtors believe that the Plan will satisfy all requirements for Confirmation, the Bankruptcy Court might not reach that conclusion. It is also possible that modifications to the Plan will be required for Confirmation and that such modifications would necessitate resolicitation of votes. Confirmation requires, among other things, a finding by the Bankruptcy Court that it is not likely there will be a need for further financial reorganization and that the value of Distributions to dissenting members of Impaired Classes would not be less than the value of Distributions the holders of Claims or Equity Interests in such Classes would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that dissenting members of Impaired Classes will receive distributions at least as great as they would receive in a liquidation under Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests have been met.

    **2.      The Effective Date or the Substantial Consummation Date Might Be Delayed or Never Occur.**

There is no assurance as to the timing of the Effective Date or substantial consummation or that they both will occur. If the respective conditions precedent to the Effective Date and substantial consummation have not occurred or been waived within the prescribed time frames, the Confirmation Order will be vacated. In that event, the holders of Claims would be restored to their respective positions as of the day immediately preceding the Confirmation Date, and the

40

Debtors' obligations for Claims and Equity Interests would remain unchanged as of such day (except to the extent of any post-Effective Date payments).

### 3.    **The Projected Value of Estate Assets Might Not Be Realized.**

In the Best Interests Analysis discussed herein with respect to the Plan, the Debtors and the Majority Equity Holders have projected the value of the Estate's assets that would be available for payment of expenses and Distributions to Holders of Allowed Claims, as set forth in the Plan in the event of liquidation of the Estate's assets. The Debtors and the Majority Equity Holders made certain assumptions, which should be read carefully.

### 4.    **Allowed Claims May Exceed Projections.**

The Debtors and the Majority Equity Holders have also projected the amount of Allowed Claims in each Class in the Best Interests Analysis. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected. Specifically, approximately $28.8 million in Claims have been asserted by the Carriers. Of these Claims, approximately $24.8 million is based upon VoIP access charges, which are disputed by the Debtors. For the reasons discussed above, the Debtors and the Majority Equity Holders believe that the Claims in the VoIP Litigation relating to VoIP-originated traffic are without merit and ultimately will be disallowed. The Debtors and the Majority Equity Holders do not believe there is a substantial likelihood that the Claims based VoIP-originated traffic would be allowed in part and disallowed in part. However, Claims based on the portion of the Carrier Claims that relate to TDM-originated interexchange traffic and other non-VoIP charges, which the Debtors project constitute about $4,000,000 of the Carrier Claims, are likely to be allowed, at least in part.[13] Therefore, the Debtors project that the total amount of Allowed Claims in Classes 3 and 4 will be approximately $4,750,000 to $5,800,000. However, if the Claims for VoIP-originated traffic are allowed, the total amount of Allowed Claims in Classes 3 and 4 will be approximately $29.5 million to $30.6 million.

Further, litigation of the Carrier Claims following Confirmation is necessary to determine whether such Claims will be allowed or disallowed. The cost of this litigation is based on numerous variables and cannot be determined at this time, but could substantial. The ultimate costs will depend on whether the Reorganized Debtor's objections to the Carrier Claims are consolidated into a single proceeding, whether the outcome of any objections to the Carrier Claims are appealed, and whether the Bankruptcy Court modifies or terminates the automatic stay with regard to any of the VoIP Lawsuits to permit such VoIP Lawsuits to proceed in a forum other than the Bankruptcy Court, among other factors.

Moreover, if the Claims based on VoIP-originated traffic are allowed, the Administrative Claims on account of VoIP-originated access charges incurred subsequent to the Petition Date will be substantial, and could exceed the total value of the estates' Assets. Obviously, recovery for the Allowed Unsecured Claims under the Joint Plan will diminish significantly should the VoIP Litigation be decided in favor of the Carriers.

As none of the Carriers have filed Administrative Claims as of the date of this Disclosure Statement, the Debtors can only estimate the amount of Carrier Administrative Claims that might

---

[13] A portion of the Carrier Claims are based on traffic TDM-originated interexchange traffic and other non-VoIP charges, rather than VoIP-originated traffic, and the Debtor and the Majority Equity Holders do not contest these non-VoIP charges under the 1996 Act, though such Claims may be disputed on other grounds. The Debtors and Majority Equity Holders do not concede that any holder of a Carrier Claim may recover any attorneys' fees or costs.

be asserted. The Bar Date for Administrative Claims is March 21, 2011, as more fully discussed in Section VII.B.1. Subsequent to the Bar Date, the Debtors or the Plan Proponents will request estimation of the allowable amount of such Administrative Claims for the purpose of Confirmation.

>    5.    **No Representations Outside of This Disclosure Statement Are Authorized.**

No representations concerning or related to the Debtors, the Reorganization Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**H.    Risks Related to the Debtors' Business Operations.**

The following discussions of risks that relate to the Debtors' business should be read as also being applicable to the business of Reorganized Debtor under the Joint Plan.

>    1.    **Effect of the Bankruptcy Case.**

If the Bankruptcy Case continues for a prolonged amount of time, the proceedings could adversely affect' the Debtors' business and operations with respect to the Hosted Services segment. The longer the Bankruptcy Case continues, the more likely it is that customers and suppliers may lose confidence in the Debtors' ability to successfully reorganize its business and will seek to establish alternative commercial relationships. Consequently, the Debtors might lose valuable contracts and other business relationships in the course of the Bankruptcy Case.

So long as the Bankruptcy Case continues, the Debtors' senior management will be required to devote significant time and effort to dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Bankruptcy Case will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtor's business.

Furthermore, so long as the Bankruptcy Case continues, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

While cash flow projections indicate there will be sufficient cash flow to meet all ordinary demands and to pay professional fees and expenses, prolonged continuation of the Bankruptcy Case could require the Debtors to seek additional financing. It may not be possible to obtain additional financing during or after the Bankruptcy Case on commercially reasonable terms or at all. If the Debtors require additional financing during the Bankruptcy Case and are unable to obtain it on reasonable terms or at all, the Debtors' chances of a successful reorganization may be seriously jeopardized.

# XIII.
## POST EFFECTIVE DATE OPERATIONS AND PROJECTIONS

From and after the Effective Date, the Reorganized Debtor will continue to operate the Hosted Services segment of Debtors' business as a going concern and likely will be managed by current management of the Debtors subject in all respects to the terms and conditions of the Amended Articles and Plan Documents.

## A.    Vesting of Assets.

Upon the Effective Date, pursuant to Bankruptcy Code Section 1141(b) and (c), except to the extent such property is not to be retained by the Reorganized Debtor, all property of the Estate will vest in the Reorganized Debtor free and clear of all claims, liens, encumbrances, charges, and other interests, except as otherwise provided in the Joint Plan or in the Confirmation Order.  From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Joint Plan. Without limiting the foregoing, pursuant to Bankruptcy Code Section 1123(b)(3), except for any Causes of Action expressly waived by the Debtor pursuant to the terms of the Plan, the Reorganized Debtor will retain and will have the exclusive right, in its discretion, to enforce against any Person any and all Causes of Action of the Debtor.  The resolution of such Causes of Action not resolved as of the Confirmation Date will be the responsibility of the Reorganized Debtor's management, subject to further direction in accordance with the operating agreement of the Reorganized Debtor.

## B.    Retention of Causes of Action/Reservation of Rights.

Except as specifically provided herein, nothing contained in the Joint Plan or the Confirmation Order will be deemed to be a waiver or the relinquishment of any rights, Claims or Causes of Action that the Debtors may have or which a Reorganized Debtor may acquire pursuant to the Joint Plan or applicable law and choose to assert on behalf of the Estate or itself, in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person, to the extent such Person asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtor, or any of their officers, directors, members, agents or representatives; (ii) the avoidance of any transfer by or obligation of the Estate or the Debtors or the recovery of the value of such transfer; (iii) the turnover of any property of the Estate; and/or (iv) Claims against third parties.

Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtor will have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, or other legal or equitable defenses which the Debtors had immediately prior to the Petition Date as fully as if the Reorganization Case had not been commenced, and all of the Reorganized Debtor's legal and/or equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Reorganization Case had not been commenced.

## XIV.
## DISCHARGE AND INJUNCTION

As the Joint Plan seeks to continue the Operations of the Reorganized Debtor as going concern, the Joint Plan provides significant protections to each of the Debtors, the Reorganized Debtor, and the Majority Equity Holders by way of its discharge, injunction, and exculpation provisions.

> **PLEASE REVIEW THE FOLLOWING RELEASE
> AND EXCULPATION PROVISIONS CAREFULLY.**

**A.** **Discharge of the Debtors, Majority Equity Holders and of Claims and Termination of Equity Interests.**

*Upon the Effective Date and in consideration of the rights afforded in the Joint Plan and the payments and distributions to be made under the Joint Plan, except as otherwise provided herein or in the Confirmation Order, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder will be deemed to have forever waived, released, and discharged each of the Debtors and the Reorganized Debtor, to the fullest extent permitted by Bankruptcy Code Section 1141, of and from any and all Claims, the Equity Interests, rights, and liabilities that arose prior to the Effective Date of any kind, nature, or description whatsoever, including any accrued interest who, in exchange for the treatment afforded to such Claims or Equity Interests under the Joint Plan, and each such holder (as well as any trustees and agents on behalf of each such holder) of a Claim or Equity Interest and any affiliate of such holder will be deemed to have granted, and will grant to each of the Debtors, the Reorganized Debtor, and the Majority Equity Holders the waiver, release and discharge described in this Section.*

*Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Equity Interests and their affiliates will be forever precluded and enjoined, pursuant to Bankruptcy Code Sections 105, 524, and 1141, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors or the Reorganized Debtor, or against any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or proof of Equity Interest.*

**B.** **Term of Pre-Confirmation Injunctions or Stays.**

Unless otherwise provided in the Joint Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Reorganization Case in accordance with Bankruptcy Code §§ 105 or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the applicable order.

**C.** **Injunction Against Interference with Plan.**

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, will be enjoined from taking any actions to interfere with the implementation or consummation of the Joint Plan.

**D.** **Injunction.**

*Except as otherwise expressly provided in the Joint Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are*

44

*permanently enjoined, with respect to any such Claims or Equity Interests, as of the Confirmation Date but subject to the occurrence of the Effective Date, from (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estate, the Majority Equity Holders or the Reorganized Debtor or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estate, the Majority Equity Holders or the Reorganized Debtor or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estate, the Majority Equity Holders or the Reorganized Debtor or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Joint Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of the Joint Plan; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Joint Plan, such as commencing or continuing in any manner, any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Joint Plan; provided, however, that nothing contained herein will preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Joint Plan.*

**E.**    **Exculpation and Limitation of Liability.**

*None of the Debtors, the Reorganized Debtor, the Majority Equity Holders or any of their respective current or former members, partners, officers, directors, employees, managers, advisors, professionals, affiliates, or agents of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons, but solely in their capacities as such) will have or incur any liability to any holder of any Claim or Equity Interests for any act or omission in connection with, related to, or arising out of, without limitation, the Reorganization Case, the negotiation and execution of the Joint Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Joint Plan, the consummation of the Joint Plan, or the administration of the Joint Plan or the property to be distributed under the Plan, including, without limitation, the Plan Documents and any other documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Joint Plan, except willful misconduct, fraud, knowing misrepresentation or gross negligence as determined by a Final Order of the Bankruptcy Court. The foregoing parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Joint Plan. Nothing in this Section will (i) be construed as a release of any entity's fraud, knowing misrepresentation, gross negligence or willful misconduct with respect to matters set forth in this Section or (ii) limit the liability of attorneys for the Debtors, the Reorganized Debtor or the Majority Equity Holders to their respective clients pursuant to any applicable Code of Professional Responsibility.*

**F.**     **Injunction Related to Releases and Exculpation.**

*The Confirmation Order will permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Joint Plan.*

**G.**     **Termination of Subordination Rights and Settlement of Related Claims.**

1.     Except as provided in the Joint Plan, the classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments under the Joint Plan take into account or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code Section 510(b) or otherwise, and any and all such rights are settled, compromised and released pursuant to the Joint Plan.  The Confirmation Order will permanently enjoin, effective as of the Effective Date, all Persons from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to this Article.

2.     Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Joint Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a holder of a Claim or Equity Interests may have or any distribution to be made pursuant to the Plan on account of such Claim or Equity Interest.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtor, their respective properties, and holders of Claims and Equity Interests, and is fair, equitable and reasonable.

**H.**     **Release of Liens.**

Except as otherwise specifically provided in or contemplated by the Joint Plan, the Amended or in any contract, instrument or other agreement or document created in connection with the Joint Plan, (a) each holder of: (i) any Tax Claim; (ii) any Claim that is purportedly secured; and/or (iii) any judgment, personal property or ad valorem tax, mechanics' or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, will, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or a Proof of Claim with respect to such Claim has been filed:  (x) turn over and release to the Estate or the Reorganized Debtor, as the case may be, any and all property of the Debtors or the Estate that secures or purportedly secures such Claim, or such lien and/or Claim will automatically, and without further action by the Debtors, the Estate or the Reorganized Debtor, be deemed released; and (y) execute such documents and instruments as the Reorganized Debtor requires to evidence such holder's release of such property or lien, and if such holder refuses to execute appropriate documents or instruments, the Debtors, the Estate or the Reorganized Debtor (as applicable) may, in their discretion, file a copy of the Confirmation Order in the appropriate recording office, which will serve to release any holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property will revert or be transferred to the Reorganized Debtor free and clear of all Claims and interests, including, without limitation, liens, escrows, charges, pledges, encumbrances and/or security interests of any kind.

46

## XV.
## POST-CONFIRMATION REPORTING AND QUARTERLY FEES TO THE UNITED STATES TRUSTEE.

All fees payable pursuant to Section 1980 of Title 28 of the United States Code, 28 U.S.C. § 1980, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law. All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

## XVI.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary does not constitute either a tax opinion or tax advice to any person. No representations regarding the effect of implementation of the Plan on individual holders of any Claim or Equity Interest are made herein or otherwise. Rather, the tax disclosure is provided for informational purposes only. All Creditors and holders of Equity Interests are urged to consult their respective tax advisor regarding the tax consequences of the Plan.

Creditors, holders of Equity Interests, and other parties in interest, and any Person affiliated with the foregoing, are strongly urged to consult their respective tax advisor regarding the federal, state, local, and foreign tax consequences that may result from the confirmation and consummation of the Plan. This Disclosure Statement shall not in any way be construed as making any representations regarding the particular tax consequences of the confirmation and consummation of the Plan to any Person. This Disclosure Statement is general in nature and is merely a summary discussion of potential tax consequences and is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), and pertinent regulations, rulings, court decisions, and treasury decisions, all of which are potentially subject to material and/or retroactive changes.

Under the IRC, there may be federal income tax consequences to Debtors, holders of Equity Interests, their Creditors, and/or any Person affiliated therewith as a result of confirmation and consummation of the Plan.

Upon the confirmation and consummation of the Plan, Priority Creditors and certain Unsecured Creditors will receive either a full payment of their respective Claims or a partial payment of their respective Claims. The payment of Claims will consist of principal, and in some cases, will include interest. Similarly, if the Debtors or Reorganized Debtor, as applicable, are successful in challenging the Disputed Carrier Claims and other Disputed Claims, and all Allowed Claims in Classes 3, 4, and 5 are paid in full, holders of Equity Interests will receive partial payment on account of their Equity Interests. The federal income tax consequences to Creditors and their affiliates arising from the Plan will vary depending upon, among other things, the type of consideration received by the Creditor in exchange for its Claim or Equity Interest, whether the Creditor reports income using the cash or accrual method of accounting, whether the Creditor has taken a "bad debt" deduction with respect to its Claim, whether the Creditor received consideration in more than one tax year, and whether the Creditor is a resident of the United States. If a Creditor's Claim is characterized as a loss resulting from a debt, then the extent of the deduction will depend on whether the debt is deemed wholly worthless or partially worthless, and whether the debt is construed to be a business or non-business debt as determined under IRC §166.

47

Holders of Claims or Equity Interests should consult their tax advisor regarding the tax treatment (including federal, state, local, and foreign tax consequences) of their respective Claims or Equity Interests. This disclosure is not a substitute for tax planning and specific advice for Persons affected by the Plan.

## XVII.
## CONFIRMATION OF THE PLAN

### A.    Confirmation of a Plan.

Pursuant to Section 1128(a), the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the United States Bankruptcy Court, 300 Las Vegas Blvd. South, Las Vegas, Nevada 89101, commencing on April 1, 2011 at 9:30 a.m. PST.

### B.    Objections To Confirmation of the Plan.

Section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

Gordon Silver
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
702-796-5555 Telephone
702-369-2666 Facsimile
Email: mzirzow@gordonsilver.com
Attn: Matthew C. Zirzow, Esq.

and

Santoro, Driggs, Walch, Kearney, Holley & Thompson
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89129
Email: Rholley@Nevadafirm.com
Attn: Richard F. Holley, Esq.

For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section 1129. In this regard, the Plan must satisfy, among other things, the following requirements.

### C.    Best Interest of Creditors and Liquidation Analysis.

Pursuant to Section 1129(a)(7), for the Plan to be confirmed, it must provide that holders of Claims and Equity Interests will receive at least as much under the Plan as they would receive in a liquidation of Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each holder of an Allowed Claim or Equity Interest of such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if Debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under the Plan by the holders of Allowed Claims or Equity Interests in each Class of Creditors equals or exceeds the value that would be allocated to such holders in a liquidation under Chapter 7 of the Bankruptcy Code. Debtors believe that the Plan meets the Best Interest Test and provides value which is not

48

less than that which would be recovered by each such holder in a Chapter 7 bankruptcy proceeding.

Generally, to determine what holders of Allowed Claims and Equity Interests in each impaired Class would receive if Debtors were liquidated in a Chapter 7 proceeding, the Bankruptcy Court must determine what funds would be generated from the liquidation of Debtors' Assets and properties in the context of a Chapter 7 liquidation case, which for unsecured creditors would consist of the proceeds resulting from the disposition of the Assets of the Debtors, augmented by the unencumbered Cash held by Debtors at the time of the commencement of the liquidation case. Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Priority Claims as may result from the termination of Debtors' business and the use of Chapter 7 for the purpose of liquidation.

In a Chapter 7 liquidation, holders of Allowed Claims and Equity Interests would receive distributions based on the liquidation of the non-exempt assets of Debtors, which would include the interest of the Debtors in the Cash, Assets, Avoidance Actions, and any Litigation Claims. However, the net proceeds from the collection of property of the Estate available for distribution to Creditors would be reduced by any commission payable to the Chapter 7 trustee and the trustee's attorneys' and accounting fees, as well as the administrative costs of the Chapter 11 estate (such as the compensation for Chapter 11 Professionals). The Estate has already absorbed the cost of obtaining the knowledge to prosecute the Claim objections that remain, as well as any Litigation Claims, a cost that would almost certainly be duplicated by a Chapter 7 trustee and his professionals.

It is further anticipated that a Chapter 7 liquidation would result in significant delay in the payment to Creditors. Among other things, a Chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Reorganization Case to a case proceeding under Chapter 7. Hence, a Chapter 7 liquidation would not only delay distribution but raise the prospect of additional Claims that were not asserted in the Reorganization Case.

Moreover, Claims that may arise in the Chapter 7 case or result from the Reorganization Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-Chapter 11 Allowed Priority Claims, Allowed General Unsecured Claims, and Equity Interests.

In a Chapter 7, the distributions from the Assets would be paid Pro Rata according to the amount of the aggregate Claims held by each Creditor. Debtors believe that the "absolute priority rule" would be applicable in a Chapter 7. Under that rule, no junior Creditor may receive any distribution until all senior Creditors are paid in full, with interest, and no Equity Interest holder may receive any distribution until all Creditors are paid in full.

Debtors have determined that confirmation of the Plan will provide each Creditor and holder of an Equity Security with no less of a recovery than it would receive if Debtors were liquidated under Chapter 7. In liquidation under Chapter 7, Debtors have determined that: (i) holders of Administrative Claims; (ii) holders of Priority Claims; and (iii) holders of Allowed Priority Unsecured Claims will be paid in full. Holders of General Unsecured Claims will receive a Pro Rata distribution of the remaining Assets, which remaining Assets will be less than the Assets available pursuant to the Plan.

49

This determination is based upon the effect that a Chapter 7 liquidation would have on the Assets available for distribution to Creditors and holders of Equity Interests, including: (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; and (ii) the amount of existing Claims and the substantial increases in Claims that would have to be satisfied on a priority basis or on a parity basis with Creditors in the Reorganization Case. Moreover, upon conversion to a Chapter 7, the Hosted Services segment would lose its "going concern" value, which would be likely to substantially reduce the liquidation value of the Assets comprising the Hosted Services segment.

Debtors also believe that the value of any distributions from the Assets to Allowed Claims in a Chapter 7 case would be less than the value of distributions under the Plan because such distributions in the Chapter 7 case would not occur for a substantial period of time. In the likely event litigation were necessary to resolve Claims asserted in the Chapter 7 case, the delay could be prolonged for several years.

When the cost of liquidation is considered as well as the time delay in receiving distributions, Debtors and the Majority Equity Holders believe that certain Creditors will receive substantially smaller distributions pursuant to a Chapter 7 liquidation than under the Plan. The Liquidation Analysis attached hereto as Exhibit "B" summarizes Debtors' and the Majority Equity Holders' best estimate of recoveries by Creditors and holders of Equity Securities in the event of Chapter 7 liquidation of Debtors as of March 1, 2011.

Under the Plan, the impaired Classes of Claims and Equity Interests are Class 2-6. The value provided under the Plan to these Classes is not less than they would receive in liquidation.

**D.    Feasibility.**

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of Debtor (the "Feasibility Test"). For the Joint Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtors and the Reorganized Debtor will possess the resources and working capital necessary to meet its obligations under the Plan.

The Majority Equity Holders and the Debtor have attached the Annual Income Statement and Cash Position as Exhibit "C." The Majority Equity Holders and the Debtors submit that the financial projections demonstrate that the Debtors are capable of satisfying the obligations proposed under the Joint Plan, including the payment of amounts due under the Note.

In addition, as can be seen from the historical financial data and monthly financial reports of the Debtors, the Debtors have generally generated revenue with respect to the Hosted Services segment. As such, the Reorganized Debtor is capable of meeting all Cash demands under the Joint Plan.

**E.    Accepting Impaired Class.**

Because a Class of Claims is impaired under the Plan, for the Plan to be confirmed, the Plan must be accepted by at least one (1) impaired Class of Claims (not including the votes of insiders of the Debtors). For an impaired Class of Claims to accept the Joint Plan, those representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

102498-002/1140438_3.doc

**F.**  **Confirmation Over Dissenting Class ("Cram Down").**

If there is less than unanimous acceptance of the Joint Plan by impaired Classes of Claims or Equity Interests, the Bankruptcy Court nevertheless may confirm the Plan. Section 1129(b) provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that: (i) the Plan does not discriminate unfairly, and (ii) the Plan is fair and equitable with respect to the rejecting Class(es) of Claims or Equity Interests impaired under the Plan, the Bankruptcy Court may confirm the Joint Plan despite the rejection of the Plan by dissenting impaired Class of Claims or Equity Interests. Debtors and the Majority Equity Holders will request confirmation of the Joint Plan pursuant to Section 1129(b) with respect to any impaired Class or Claims or Equity Interests which does not vote to accept the Plan. Debtors believe that the Plan satisfies all of the statutory requirements for Confirmation, that Debtors and the Majority Equity Holders have complied with or will have complied with all the statutory requirements for Confirmation of the Joint Plan, and that the Plan has been proposed in good faith. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

**G.**  **Allowed Claims.**

You have an Allowed Claim if: (i) you or your representative timely filed a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely filed a proof of Claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim; (iii) your Claim is listed by a Debtor in its respective Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by a Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to allow your Claim. Under the Plan, the deadline for filing objections to Claims is to be set by the Bankruptcy Court. If your Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Rule 3018. If you are uncertain as to the status of your Claim or Equity Interest or if you have a dispute with Debtors you should check the Bankruptcy Court record carefully, including the Schedules of each Debtor, and you should seek appropriate legal advice. Debtors and their professionals cannot advise you about such matters.

**H.**  **Impaired Claims and Equity Interests.**

Impaired Claims and Equity Interests include those whose legal, equitable or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor or Equity Interest holder, or if the full amount of the Allowed Claim or Equity Interest will not be paid under the Plan. Holders of Claims that are not impaired under the Plan are deemed to have accepted the Plan pursuant to Section 1126(f) and Debtors need not solicit the acceptances of the Plan of such unimpaired Claims. Holders of Claims or Equity Interests which are to receive nothing under the Plan are deemed to have voted to reject the Plan neither the Debtors nor the Equity Holders will solicit the acceptances of the Plan from such impaired Creditors.

51

**I.**   **Voting Procedures.**

   1.   **Submission of Ballots.**

   All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a copy of this approved Disclosure Statement and a copy of the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent with this Disclosure Statement. You should complete your Ballot and return it as follows:

Gordon Silver
Attn: Gabrielle A. Hamm, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
(702) 796-5555 Telephone
(702) 369-2666 Facsimile

   TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M. PACIFIC STANDARD TIME, on April 6, 2011.

   2.   **Incomplete Ballots.**

   Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote in support of the Plan.

   3.   **Withdrawal Of Ballots.**

   A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

   4.   **Questions And Lost Or Damaged Ballots.**

If you have any questions concerning these voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact:

Gordon Silver
Attn: Gabrielle A. Hamm, Esq.
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, Nevada 89169
(702) 796-5555 Telephone
(702) 369-2666 Facsimile
Email: ghamm@gordonsilver.com

# XVIII.
# ALTERNATIVES TO THE PLAN

   Debtors believe that the Plan provides Creditors the best and most complete form of recovery available. As a result, Debtors believe that the Plan will serve the best interests of all Creditors and parties-in-interest in the Reorganization Case.

   Debtors believe that the Plan, as described herein, fairly adjusts the rights of various Classes of Creditors and holders of Equity Interests and enables the Creditors and holders of Equity Interests to realize the greatest sum possible under the circumstances. Debtors also believe that rejection of the Plan in favor of some theoretical alternative method of reconciling

52

102498-002/1140438_3.doc

the Claims and Equity Interests of the various Classes will require, at the very least, an extensive and time consuming negotiation process and will not result in a better recovery for any Class. It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

If a plan cannot be confirmed, a Chapter 11 case may be converted to a case under Chapter 7, in which a Chapter 7 trustee would be elected or appointed to liquidate the assets of debtor for distribution to their creditors and holders of equity security in accordance with the priorities established by the Bankruptcy Code. For a discussion of the effect that a Chapter 7 liquidation would have on the recovery by creditors, see Section XVII.C "Confirmation of the Plan -- Best Interest of Creditors and Liquidation Analysis."

As previously stated, Debtors believe that a liquidation under Chapter 7 would result in a substantially reduced recovery of funds by its Estate because of: (i) additional Administrative Expenses involved in the appointment of a Chapter 7 trustee for the Debtors and attorneys and other professionals to assist such Chapter 7 trustee; (ii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation; and (iii) the loss of the "going concern" value of the Debtors' business. Accordingly, Debtors believe that holders of certain classes of Claims may be expected to receive substantially smaller distributions pursuant to a Chapter 7 liquidation than under the Plan.

## XIX.
## PREFERENCE AND OTHER AVOIDANCE ACTIONS

A debtor-in-possession may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under Chapter 7 of the Bankruptcy Code had the payment not been made, if: (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced; or (ii) if the creditor is found to have been an "insider" as defined in the Bankruptcy Code, within one (1) year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case. A bankruptcy trustee (or the entity as debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two years (and under applicable Nevada law, four years) before the date the bankruptcy case was commenced if: (i) debtor received less than a reasonably equivalent value in exchange for such transfer; and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left debtor with an unreasonably small capital, or debtor intended to incur debts that would be beyond debtor's ability to pay as such debts matured.

Debtors believe avoidable transfers may have been made, which transfers will be further analyzed and subsequent preference or avoidance actions brought if appropriate under the Plan. Debtors have not fully analyzed various potential preference or other avoidance actions and it is conceivable that additional prepetition transactions may be avoidable. Debtors thus hereby expressly reserve their right to commence any appropriate avoidance and/or preference actions.

102498-002/1140438_3.doc

## XX.
## RECOMMENDATION AND CONCLUSION

Debtors and the Majority Equity Holders believe that the Plan provides the best possible recovery for all parties in interest. Accordingly, Debtors recommend that all Creditors who are entitled to vote on the Plan should vote to accept the Plan.


DATED: February ____, 2011.


COMMPARTNERS CARRIER SERVICES          MAJORITY EQUITY HOLDERS
CORP., a Nevada corporation

COMMPARTNERS HOLDING CORP., a
Nevada corporation                                     By: ___/s/ Daniel A. Cartwright_____
                                                                    DANIEL A. CARTWRIGHT
COMMPARTNERS, LLC, a Nevada limited
liability company

COMMPARTNERS NETWORK SERVICES,
LLC, a Nevada limited liability company


By: _____
Dave Clark

Chief Executive Officer



Prepared and submitted by:

GORDON SILVER                                         SANTORO, DRIGGS, WALCH,
                                                                    KEARNEY, HOLLEY & THOMPSON

By: _____                  By: ___/s/ Richard F. Holley_____
GREGORY E. GARMAN, ESQ.                     RICHARD F. HOLLEY, ESQ.
MATTHEW C. ZIRZOW, ESQ.                      VICTORIA L. NELSON, ESQ.
GABRIELLE A. HAMM, ESQ.                       OGONNA M. ATAMOH, ESQ.
3960 Howard Hughes Pkwy., 9th Floor          400 South Fourth Street, Third Floor
Las Vegas, Nevada 89169                             Las Vegas, Nevada 89101
Attorneys for Debtors                                    Attorneys for Majority Equity Holders

54

## XX.
## RECOMMENDATION AND CONCLUSION

Debtors and the Majority Equity Holders believe that the Plan provides the best possible recovery for all parties in interest. Accordingly, Debtors recommend that all Creditors who are entitled to vote on the Plan should vote to accept the Plan.

DATED: February ____, 2011.

COMMPARTNERS CARRIER SERVICES CORP., a Nevada corporation

COMMPARTNERS HOLDING CORP., a Nevada corporation

COMMPARTNERS, LLC, a Nevada limited liability company

COMMPARTNERS NETWORK SERVICES, LLC, a Nevada limited liability company

By: _____
Dave Clark
Chief Executive Officer

MAJORITY EQUITY HOLDERS

By: _____

Its: _____

Prepared and submitted by:

GORDON SILVER

By: _____
GREGORY E. GARMAN, ESQ.
MATTHEW C. ZIRZOW, ESQ.
GABRIELLE A. HAMM, ESQ.
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Attorneys for Debtors

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

By: _____
RICHARD F. HOLLEY, ESQ.
VICTORIA L. NELSON, ESQ.
OGONNA M. ATAMOH, ESQ.
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Attorneys for Majority Equity Holders

54

102498-002/1140438_3