GORDON SILVER
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
E-mail: ggarman@gordonsilver.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@gordonsilver.com
GABRIELLE A. HAMM, ESQ.
Nevada Bar No. 11588
E-mail: ghamm@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>COMMPARTNERS HOLDING CORPORATION,<br>a Nevada corporation<br>☐ Affects this Debtor.<br>☒ Affects all Debtors.<br>☐ Affects COMMPARTNERS, LLC, a Nevada<br>　　limited liability company<br>☐ Affects COMMPARTNERS CARRIER<br>　　SERVICES CORPORATION, a<br>　　Nevada corporation<br>☐ Affects COMMPARTNERS NETWORK<br>　　SERVICES, LLC, a Nevada limited<br>　　liability company | Case No.: BK-S-10-20932-LBR; Chapter 11<br>Substantively Consolidated and Jointly<br>Administered with:<br><br>10-20933　CommPartners, LLC<br>10-20934　CommPartners Carrier Services Corp.<br>10-20935　CommPartners Network Services, LLC<br><br>**SALES PROCEDURE HEARING:**<br>Date: April 11, 2011<br>Time: 3:00 p.m. PDT<br><br>**SALE HEARING:**<br>Date: April 26, 2011<br>Time: 1:30 p.m. PDT |

**MOTION FOR ORDER: (I) APPROVING PROCEDURES FOR THE SALE OF THE DEBTORS' HOSTED SERVICES ASSETS, (II) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

CommPartners Holding Corporation, a Nevada corporation ("CHC"), CommPartners, LLC, a Nevada limited liability company ("CL"), Commpartners Carrier Services Corporation, a Nevada corporation ("CCSC"), and Commpartners Network Services, LLC, a Nevada limited liability company ("CNS" and, together with CHC, CL and CCSC, the "Debtors" or "Sellers"), debtors and debtors-in-possession, respectfully submit their motion (the "Motion") for an order: (i) approving procedures for the sale of the Debtors' Hosted Services (as hereinafter defined) assets, comprising substantially all of the Debtors' remaining property, (ii) authorizing the sale of such assets, free and clear of all liens, claims, interests and encumbrances, (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith, and (iv) granting related relief.[1]    By this Motion, the Debtors are requesting that the Court approve the sales procedures described herein at the initial hearing on April 11, 2011, and that the Court conduct a live, in court auction for those assets, subject to the sales procedures, at a final sale hearing on April 26, 2011.

This Motion is made and based on the points and authorities herein, the Declaration of Gregory Roeper filed contemporaneously herewith (the "Roeper Declaration"), the Omnibus Declaration of Greg Roeper in Support of Debtors' First Day Motions [ECF No. 7], the pleadings, papers and other records contained in the Court's file in these cases, judicial notice of which are respectfully requested, and any argument or other evidence presented to the Court at any hearing on this Motion.

. . .

. . .

. . .

---

[1] Nothing in this Motion is intended or should be construed as altering or amending the terms and conditions of the Purchase Agreement. To the extent of any inconsistencies between this Motion and the Purchase Agreement, the Purchase Agreement shall control.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

2

# I.
# INTRODUCTION

1.      On April ___, 2011, the Debtors executed that certain Asset Purchase Agreement (the "Purchase Agreement") with Leading Edge Communications, Inc., a Delaware corporation ("Leading Edge" or the "Stalking Horse").   The terms and conditions of the Purchase Agreement are subject to a competitive bidding process proposed to be conducting at the hearing on the Motion, which may yield a higher and better offer, and are subject to the Court's ultimate approval of the transfer of assets and agreements to the Stalking Horse or a higher and better offeror (the "Buyer").

2.      The Debtors propose that Stalking Horse acquire the assets relating to the Debtors' Hosted Services business segment (as described below), for a Purchase Price of $1,660,000.00, payable in cash, and the assumption of certain Assumed Liabilities (as defined in the Purchase Agreement), subject to overbids and the sales procedures set forth herein.  A true and correct copy of the proposed Purchase Agreement is attached to the Roeper Declaration **Exhibit 1**.

# II.
# JURISDICTION AND VENUE

3.      On June 13, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing their above-captioned bankruptcy cases (the "Chapter 11 Cases").[2]

4.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), and (N).

5.      Venue of the Debtors' Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory basis for the relief sought herein is Sections 105, 363, 365, 1107, and 1108 of the Bankruptcy Code, as complimented by Bankruptcy Rules 6004 and 6006.

---

[2] All references to "Chapter" and "Section" herein are to title 11 of the U.S. Code (the "Bankruptcy Code"), and all references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

3

7.    The Debtors continue to operate their businesses and manage their affairs as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been established in these Chapter 11 Cases.

8.    The Debtors' Chapter 11 Cases are jointly administered [ECF No. 20], and their bankruptcy estates have been substantively consolidated [ECF No. 251].

## III.
## STATEMENT OF FACTS

A.    **Background Regarding the Debtors' Businesses.**

9.    The Debtors collectively constituted a facilities-based network operator providing voice over internet protocol ("VoIP") and time-division multiplexing ("TDM") services to communications carriers as well as enhanced hosted applications to small and medium sized businesses through a network of strategic partners and resellers.

10.    The Debtors' network was built through CL, which was an authorized competitive local exchange carrier ("CLEC") in 46 states.  Pursuant to its CLEC status, CL was entitled under federal law to obtain wholesale services from incumbent local exchange carriers ("ILECs") either through specialized contracts known as interconnection agreements ("ICAs"), or in some instances through traffic exchanges that may not be governed by a written agreement, as inputs to provide service to its own customers.  The ILECs are either the monopoly local providers that were part of the unified Bell system or local providers (often serving rural areas) that were not part of the Bell system.  CLECs also often obtain wholesale services from other CLECs or providers as inputs to provide its own services to customers.

11.    Through CCSC, the Debtors provided domestic and international carriers with wholesale carrier services.  In this capacity, CCSC served as the "middle man" for phone calls originated on other carriers' networks and terminated on yet another carrier's network.

12.    Through CNS, the Debtors provide business grade, IP-based voice and other value added services such as internet protocol ("IP") based call centers, IP fax and IP call recording.  These services are sold to end user customers through a dealer network of over 250

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

4

1    resellers spread throughout the United States.

2    13.    The Debtors had two business segments: Carrier Services and Hosted Services.

3    Carrier Services provided wholesale origination and termination services to other carriers

4    throughout the United States. Essentially, the Carrier Services business contracted with either

5    enhanced service providers ("ESPs"), who generate IP-based traffic, or other carriers who, in

6    turn, have contracted with ESPs, who generate IP-based traffic, to have the traffic carried across

7    the Debtors' network, convert the traffic to TDM, and hand it off to the terminating carrier.

8    Hosted Services provides small and medium-sized businesses with IP communications

9    solutions.

10    **B.    The Debtors' Post-Petition Marketing Efforts.**

11    14.    Between the Petition Date and early October 2010, the Debtors engaged in an

12    aggressive campaign to solicit the interest of potential purchasers in a sale of all or parts of its

13    business. Given the somewhat specialized nature of the Debtors' business, the Debtors focused

14    their marketing efforts on parties already in the telecommunications industry. The Debtors'

15    marketing efforts resulted in expressions of interest from approximately seventeen (17)

16    different parties, fifteen (15) of which executed non-disclosure agreements with the Debtors to

17    conduct due diligence regarding a potential purchase, and which resulted in a handful of firm

18    offers for its business. The Debtors also had discussions with various constituencies in its

19    Chapter 11 Cases--including both major unsecured creditors and shareholders--in order to fully

20    explore and to properly vet all potential parties that may be interested in its business.

21    15.    As a result of the foregoing efforts, the Debtors received an offer to purchase the

22    Hosted Services business from KeyOn Communications, Inc., a Nevada corporation ("KeyOn")

23    for $4,000,000, payable in cash, and the assumption of certain liabilities.

24    16.    Also as a result of the foregoing efforts, the Debtors received an offer to

25    purchase their Carrier Services business from Leading Edge for $440,000.00, payable in cash,

26    and assumption of certain liabilities.

27    17.    On October 8, 2010, Debtors filed a motion seeking to approve sales

28    procedures for their Hosted Services business segment to KeyOn (the "First Hosted Sale

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

5

Motion") [ECF No. 253], and a motion seeking to approve sales procedures for their Carrier Services business segment to Leading Edge (the "Carrier Sale Motion" and, together with the First Hosted Sale Motion, the "Sale Motions") [ECF No. 256].

18.    On October 22, 2010, the Majority Equity Holders filed an opposition (the "Opposition") [ECF No. 298] to the First Hosted Sale Motion.    In their Opposition, the Majority Equity Holders represented that they wanted to reorganize the Debtor around the Hosted Services segment of the business, and that they believed they could increase the share of total revenue generated by the Hosted Services division to drive margin and positive EBITDA. See Opposition, ¶¶ 30-31. The Equity Holders further represented that they "are ready, willing and able to contribute a $2.5 million in [sic] additional capital contribution through a plan of reorganization which plan will provide other interested shareholders an opportunity to contribute funds on a prorate [sic] basis in order to preserve their equity interest in the reorganized debtor." Id. at ¶ 32. Based on the foregoing, the Majority Equity Holders argued to the Court that there was no need for an expedited sale of the Debtors' Hosted Services business segment pursuant to Section 363 of the Bankruptcy Code as proposed by the First Hosted Sale Motion, and that the Debtors should instead be required to file a plan of reorganization.

19.    Other than the Opposition filed by the Majority Equity Holders, no other oppositions were filed to the First Hosted Sale Motion.  No party, including but not limited to the Majority Equity Holders, filed any opposition to the Carrier Sale Motion.

20.    On October 25, 2010, the Court held a hearing on the Sale Motions.    In the absence of any objection, the Court approved the sales procedures requested in the Carrier Sale Motion.  See ECF No. 320.  Following oral argument on the First Hosted Sale Motion and based upon the arguments made by the Majority Equity Holders, however, the Court denied the sales procedures requested in the First Hosted Sale Motion without prejudice to a similar sale being proposed in a plan of reorganization. See ECF No. 322.

21.    On November 22, 2010, the Court held a hearing on approval of the sale proposed in the Carrier Sale Motion.  At this sale hearing, the Court approved a higher and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc                                6

better offer for the Debtors' Carrier Services from Feature Group IP Southeast, LLC, a Nevada limited liability company, WorldCall Internet, Inc. and Peering Partners Communications, LLC (collectively, "Peering Partners") in the amount of $580,000.00, payable in cash, and the assumption of certain liabilities. On or about December 8, 2010, the Debtors entered into a final Asset Purchase Agreement with Peering Partners for the sale of its Carrier Services business segment. On December 13, 2010, the Court entered an Order approving the sale of the Debtors' Carrier Services business segment to Peering Partners. See ECF No. 399.

22.    Following the denial of the First Hosted Sale Motion, the Debtors began plan negotiations with both KeyOn and the Majority Equity Holders. Debtors' efforts were focused on providing an "option" style plan whereby creditors would be entitled to vote on which plan--the KeyOn sale or the Majority Equity Holders new value proposal--they would prefer. KeyOn eventually withdrew from these negotiations, however, thereby leaving the Debtors to negotiate only with the Majority Equity Holders.

23.    On December 10, 2010, the Debtors and the Majority Equity Holders filed their proposed Disclosure Statement to Accompany Joint Plan of Reorganization of the Debtors and Majority Equity Holders (as subsequently amended, the "Disclosure Statement") [ECF Nos. 396 (original), 404 (errata), 475 (first amended), 481 (second amended), 513 (third amended)], together with a proposed Joint Plan of Reorganization of the Debtors and Majority Equity Holders (as subsequently amended, the "Plan") [ECF Nos. 512 (amended)].

24.    The Plan proposed to reorganize Debtors around the Hosted Services business segment. The Plan proposed to pay allowed claims from cash on hand, collected accounts receivable, net proceeds from the sale of the Carrier Services segment, $2,500,000 in additional capital contributions by the holders of equity interests, and note distributions totaling $2,500,000. The note distributions were proposed to be paid from the proceeds of a note issued to pay allowed claims. The note distributions were proposed to consist of $800,000 payable in 2011 and $1,700,000 payable in 2012, which sums are to be derived from the operations of the Reorganized Debtor. It was estimated that under this Plan, the total amount that would be made available to holders of allowed administrative claims and allowed unsecured creditors was

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

7

$7,277,500.

25.     After filing their proposed Disclosure Statement and Plan, the Debtors and the Majority Equity Holders engaged in discussions with certain of the larger carrier claimants about the potential for a consensual resolution.  Indeed, the Debtors even went so far as to continue the hearing on the Disclosure Statement and grant numerous extensions on the carriers' briefing deadlines to allow time for such discussions.  See ECF Nos. 439, 440, 451 and 452.  Ultimately, however, the parties did not come close to an agreement for a consensual plan.

26.     As a result, various of the large carrier claimants filed objections to the proposed Disclosure Statement making numerous arguments, including specifically that the Plan was not confirmable because it did not ensure that payment of all administrative expenses would be paid in full in cash on the Effective Date pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code. The Debtors and the Majority Equity Holders responded that the carriers had not even filed applications for the allowance of such alleged administrative claims, that such claims were largely disputed, and that the Court can and need only estimate such alleged claims for purposes of confirmation.  See ECF No. 473.

27.     On February 15, 2011, the Court held a continued hearing on the proposed Disclosure Statement and orally approved it, as well as imposed a bar date for claimants to file administrative claims.

28.     On February 22, 2011, the Debtors filed and served their Notice of Bar Date for Filing Requests for Allowance of Certain Administrative Expense Claims Against the Debtors [ECF No. 508], which gave notice of the bar date of March 21, 2011 (the "Bar Date") for claimants to file applications for the allowance of administrative expenses asserted against any of the Debtors pursuant to Sections 503(b) or 507(b) of the Bankruptcy Code (the "Applications").

29.     On February 25, 2011, the Court entered an Order: (1) Approving Adequacy of Disclosure Statement to Accompany Joint Plan of Reorganization of the Debtors and Majority Equity Holders; (2) Setting Deadlines for Balloting and Opposing Confirmation of Joint Plan; (3) Approving Forms of Ballots; (4) Setting a Record Date for Voting Purposes; and (5) Setting

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

8

1  Hearing on Confirmation of Plan [ECF No. 515] (the "Disclosure Statement Order").  The

2  Disclosure Statement Order set a pretrial conference on the Applications and the Plan for April

3  19, 2011, and for hearings on estimation of the alleged administrative claims and plan

4  confirmation for April 26-29, 2011.

5        30.    Pursuant to the Disclosure Statement Order, the Debtors sent to each holder of a

6  Claim or Equity Interest a Solicitation Package (as defined in the Disclosure Statement Order).

7  See ECF No. 537.

8        31.    On March 17, 2011, the Majority Equity Holders officially notified the Debtors

9  in writing of their withdrawal from the Plan.  After further discussions with the Majority Equity

10  Holders, on March 24, 2011, the Debtors filed their Notice of Withdrawal of Debtors' and

11  Majority Equity Holders' Amended Plan of Reorganization on March 24, 2011 [ECF No. 643].

12  The Debtors also immediately began to assess their options for emergence from Chapter 11, and

13  determined that the successful continuation of the Hosted Services business without the equity

14  infusion promised by the Majority Equity Holders would not be feasible.  Thus, the Debtors

15  immediately began marketing efforts to find a purchaser for the Hosted Services, which now

16  constitutes all or substantially all of the Debtors' remaining non-cash assets.

17        32.    On April 1, 2011, the Court held a status hearing in the Debtors' Chapter 11

18  Cases [ECF No. 649], and at this hearing, scheduled a hearing on approval of the sales

19  procedures for April 11, 2011, and a sale hearing for April 26, 2011.  The Court also delayed

20  the briefing deadlines and hearings on the Applications and directed the parties to confer

21  regarding the potential use of a settlement judge to resolve the Applications.  No party

22  appearing at this hearing objected to the Court's scheduling of the Debtors' sales procedures

23  and sale of the Hosted Services assets on shortened time.

24  **C.**    **Justification for the Proposed Sale.**

25        33.    The instant Motion involves a proposed sale of their Hosted Services business

26  segment.  The Debtors believe that a sale of the Hosted Services business, as a whole, instead of

27  a separate, piecemeal sales of the Debtors' remaining assets, will result in the most economical

28  process and generate the highest and best price for its assets.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

9

34.     Since the Petition Date, the Debtors have been executing a reorganization strategy to shed their CLEC and sell their wholesale Carrier Services business, which would leave behind the Hosted Services business without any of the direct activities that lead to the significant litigation against the Debtors that necessitated the Chapter 11 Cases.

35.     On December 13, 2010, the Court entered the order approving the Carrier Sale Motion, and a separate order (the "Rejection Order") [ECF No. 397] authorizing the rejection of all of the Debtors' ICAs.  Since that date, Debtors have been focusing their efforts on (i) shutting down their previously owned CLEC network, and (ii) separating the Carrier Services and Hosted Services networks to facilitate independent operation.   Debtors have faced significant challenges in their attempts to accomplish this goal.

36.     First, the Debtors have incurred approximately $120,000 per month in charges relating to circuits previously used for the CLEC network, which the Debtors ceased operating in November 2010.  To date, these charges exceed $500,000.  These expenses are the result of AT&T's refusal to provide other network operators with disconnection notices necessary to enable these other providers, in turn, to disconnect circuits applicable to the former CLEC network.   While every Carrier other than AT&T covered by the Rejection Order promptly disconnected its circuits in compliance therewith, AT&T has yet to issue notices of disconnection.  As a result, these charges continue to accrue.

37.     Second, Peering Partners has refused to comply fully with the Memorandum of Understanding ("MOU") executed by the parties in connection with the sale of the Carrier Services business segment, including specifically the failure to timely pay for expenditures covered by the MOU.  Peering Partners' actions and failures to pay have also left the Debtors in a precarious financial state.

38.     Third, given the lengthy pendency of the Debtors' Chapter 11 Cases, many critical employees have either accepted positions for other employment or are looking for other employment. The Debtors are very concerned that losses of certain critical employees could be imminent and could significantly hamper their ability to operate much longer.

39.     Fourth, technical issues experienced in separating the Carrier Services and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

10

Hosted Services networks have resulted in increased churn of the existing Hosted Services customer base.

40.    Fifth, the continued uncertainty over the Debtors' ability to continue to provide services has and will continue to result in churn of existing customers and their associated revenue streams.

41.    Sixth, the passage of time since the originally planned sale of the Hosted Services to KeyOn has had a negative impact upon Debtors wholesale customers' marketing efforts.

42.    Finally, the combination of these factors has hindered Debtors' ability to collect its account receivables, thus negatively impacting cash flows and cash at hand for continuing operations.

43.    As a result of all of the foregoing, among other factors, the value of the Debtors' remaining Hosted Services business segment has significantly declined as evidenced by the withdrawal from the Plan by the Majority Equity Holders, and by the significantly reduced purchase price offered by Leading Edge as compared with the previous offer by KeyOn last fall for the same assets.

44.    Based on the Debtors' negotiations with other potential buyers in the marketplace and their own awareness and opinion of the value of the Hosted Services segment at this point in the proceedings, the Debtors believe the Purchase Agreement is the highest and best offer for the assets proposed to be purchased (the "Purchased Assets"). No other entity has manifested sufficient, continuing, credible and timely interest in purchasing the Purchased Assets for an agreeable purchase price and assumption of specified liabilities except for the Stalking Horse. The Debtors' negotiations with the Stalking Horse have been extensive, and the ultimate terms of the Purchase Agreement were the subject of much discussion during the negotiating process. At all times the negotiations were at arms' length and in good faith.

45.    The Stalking Horse previously tendered an offer to purchase the Debtor's Carrier Services business, but was overbid by Peering Partners. Other than this relationship, the Stalking Horse is unrelated to the Debtors, and their insiders and affiliates, and there is no

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

11

hidden consideration or promise of any nature granted to the Debtors or any of their insiders or affiliates in exchange for entering into the Purchase Agreement. As a matter of disclosure, the Debtors also advise the Court that when the sale of its Carrier Services business segment closed last year, two of the Debtors' former vice presidents who worked in the Carrier Services business did not accept jobs with Peering Partners and instead went to work with Leading Edge, where those employees remain.

46.     Moreover, if the Debtors are not permitted to conduct an immediate sale, then they will likely need to comply immediately, and at significant cost, with applicable law and regulations regarding an orderly wind down of its operations. The Debtors believe that the Federal Communications Commission (the "FCC") requires VoIP providers to go through a 3-step "streamlined" process to discontinue all or part of its services, whether or not it is in bankruptcy, as follows:

a.     Written notice must be provided to all customers where service is anticipated to be discontinued. The notice must include the name and address of the carrier, the date of the planned service discontinuance, the geographic areas where service will be discontinued, and a brief description of the type of service affected. In addition, notice must include a prescribed statement that informs customers of their right to object to the proposed discontinuance if they believe they will suffer an undue hardship (such as being unable to get service from anyone else) as a result of the discontinuance. Generally, carriers are expected to mail the notice to the customers' billing addresses, but it is possible to get permission from the FCC in advance to provide written notice in some other fashion (possibly email).

b.     File a discontinuance application with the FCC providing a description of the dates and methods of notice to customers, a statement as to whether the carrier is considered dominant or non-dominant, and any other information the FCC may require. There is no prescribed timeframe between the customer notice and the FCC filing, so long as the notice is on or after the date of customer notices. The FCC issues a public notice advising customers that they may file comments in fifteen (15) days from the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

12

1    date of the notice.  Based on past discontinuance notices, it is anticipated that the FCC

2    usually posts the notice about two (2) weeks after the application is filed.

3                c.        Send a copy of the discontinuance application to the public utility

4    commission and Governor of each state in which the discontinuance is proposed, and

5    also to the Secretary of Defense.

6           47.      Unless the FCC notifies the carrier otherwise, discontinuance applications for

7    non-dominant carriers will be automatically granted by the FCC on the 31st day after the FCC

8    issues the public notice of the discontinuance application.  Failure to follow these rules can

9    result in a minimum penalty of $5,000 per violation.

10          48.      In sum, based upon the Debtors' evaluation of the fair market value of the

11   Purchased Assets, the Debtors believe that the sale of the Purchased Assets for the requested

12   price is proper, fair, and reasonable.  Sale of the Purchased Assets will further benefit the

13   Debtors by allowing the Debtors to divest themselves of significant non-cash assets for value, to

14   provide funds for distribution to the Debtors' creditors.  As such, a sufficient business reason

15   exists for the sale.

16   **D.      The Proposed Purchase Agreement.**

17          49.      The Purchased Assets constitute the Debtors' Hosted Services business segment,

18   and include tangible assets, intellectual property, software, domain names, Purchased Contracts,

19   books, records, rights of action,  credits, claims, and non-cash assets relating to the Hosted

20   Services segment.  The Purchased Assets exclude certain Excluded Assets (as defined in the

21   Purchase Agreement), and specifically further exclude the Debtors' accounts receivable and

22   cash assets.  The Debtors do not believe that the Purchased Assets are encumbered by any liens,

23   and therefore the proposed sale will, on its face, be free and clear of liens.

24          50.      The proposed sale and assignment of the Purchased Assets to Buyer shall be

25   made on terms set forth in the Purchase Agreement.  The Purchased Assets will generally be

26   sold "as is" and "where is" with all faults, subject to the limited representations and warranties

27   expressly set forth in the Purchase Agreement.

28          51.      Pursuant to the Purchase Agreement, the Debtors will sell the Purchased Assets

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

13

1    to Purchaser for a purchase price of $1,660,000 and assumption of the Assumed Liabilities,

2    which consist of post-closing liabilities, prorated post-closing taxes, and transaction taxes.

3        52.    As part of the sale of Purchased Assets, the Purchase Agreement requires the

4    assignment to Buyer of certain contracts relating to the Hosted Services segment (the

5    "Purchased Contracts").  As such, a valid business reason exists for the Debtors to assume and

6    assign such Purchased Contracts to Buyer.

7        53.    The Debtors' ultimate commitment and obligation to transfer the Purchased

8    Assets as provided for in the Purchase Agreement shall be dependent, among other things, upon

9    the Court entering and the continued effect of the Sale Order.

10   **E.    The Proposed Sales Procedures.**

11       54.    To ensure that the price to be paid by Buyer is the best price available, the

12   Debtors seek the Court's approval of a process that will permit a final exposure of the

13   Purchased Assets to interested parties and then the Debtors' selection of the highest and best

14   offer at the Sale Hearing, by requiring compliance with the following procedures (collectively,

15   this entire Section E, the "Sales Procedures"):

16       a.    All interested persons (the "Competing Bidders") may conduct

17           reasonable due diligence for purposes of making a bid for the Purchased Assets, subject

18           to (a) execution of a commercially reasonable confidentiality agreement, and (b)

19           delivery of evidence establishing to Sellers' reasonable satisfaction such prospective

20           bidder's financial capability to timely consummate a transaction.

21       b.    Any Competing Bidder that desires to submit a competing bid for the

22           Purchased Assets (which bid may provide for a cash payment and the assumption of

23           liabilities) (a "Competing Bid") must (a) submit a Competing Bid, and (b) provide the

24           Qualifying Information.  Only Competing Bidders who submit a Competing Bid and

25           provide the Qualifying Information shall be deemed to be "Qualified Bidders."  Only

26           Qualified Bidders and the Stalking Horse may participate in the Auction.  In order to be

27           considered a Qualified Bid, a Competing Bid must be submitted by physical delivery, e-

28           mail, or facsimile so as to be actually received by Seller's counsel not later than 10:00

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

14

a.m. PDT on April 25, 2011 (the "<u>Bid Deadline</u>") and must consist of the following:

      i.      A written summary of the terms and conditions of the Competing Bid. Sellers will provide copies of all Competing Bids (consisting of the written summary and the Competing Bid Agreement) to the Stalking Horse and all Qualified Bidders by 1:00 p.m. on the Bid Deadline.

      ii.      Evidence demonstrating, to the Debtors' reasonable satisfaction, funding and/or other financial ability to pay the purchase price and timely consummate the transaction and sufficient funding to operate the Purchased Assets (after the Closing) that is the subject of the Competing Bid, to provide adequate assurance of future performance, as contemplated by Section 365 of the Bankruptcy Code, to all non-debtor contracting parties with respect to the executory contracts and unexpired leases that the Competing Bidder intends for Sellers to assume and assign to it, if any (collectively, the "<u>Qualifying Information</u>"). Sellers and the Stalking Horse may challenge the sufficiency of the Qualifying Information, and the Debtors may request additional Qualifying Information at any time prior to the conclusion of the Sale Hearing.

      iii.      An asset purchase agreement substantially in the form of the Purchase Agreement (a "<u>Competing Bid Agreement</u>") (i) containing terms and conditions that, in the aggregate, are substantially similar to or better than those contained in the Purchase Agreement (and also including a version that is black-lined against the Purchase Agreement to show all changes to the Purchase Agreement), (ii) signed by the Competing Bidder, identifying such party and its principals and relevant contact information, (iii) detailing the amount and type of consideration to be paid for the Purchased Assets, (iv) identifying the executory contracts, licenses, permits, entitlements and unexpired leases that the Competing Bidder requests that Sellers assume and/or assign to such bidder at the closing of the Sale, and (v) all other terms and conditions of the Competing Bid;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

15

iv.    Include an earnest money deposit of at least ten percent (10%) of the aggregate cash and non-cash consideration proposed in the Competing Bid Agreement in the form of a certified or cashier's check made payable to, or wire transfer completed to, Nevada Title Company or other Escrow Holder agreed to by Sellers on or before the Bid Deadline (the "Initial Deposit") (the Stalking Horse Deposit and each Initial Deposit are hereinafter referred to as a "Sale Deposit");

v.    In order to be considered a Qualifying Bid, a Competing Bid may not (i) be subject to a condition based on the outcome of due diligence, similar review, corporate approval or any other third party approvals (other than Bankruptcy Court approval); (ii) be subject to procurement of financing or funding of such financing; (iii) be subject to conditions, representations, or terms unacceptable to Seller; or (iv) provide for the Competing Bidder to receive any break-up fee, termination fee, expense reimbursement, or similar type of buyer protection payment;

vi.    All Sale Deposits shall be retained by Sellers pending the Closing of the Sale Transaction. With the exception of any Back-Up Bidder, the Sale Deposits of unsuccessful bidders shall be returned within one (1) Business Day after the Closing of the Sale Transaction.

c.    If there is no Qualified Bid other than the Stalking Horse Bid, Sellers shall not conduct the Auction and shall proceed to present the Stalking Horse Bid to the Bankruptcy Court for approval at the Sale Hearing.

d.    If any Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, Sellers shall receive additional bids for the Purchased Assets from the Qualified Bidders and the Stalking Horse at the Auction.

e.    The auction for the Purchased Assets shall be organized and conducted by Sellers at the time and in the manner prescribed by the Bankruptcy Court in open court on invitation to the Qualified Bidders and the Stalking Horse (the "Auction"). Each Qualified

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

16

1    Bidder and the Stalking Horse must be present at the Auction by and through a designated agent

2    with actual authority to speak for and bind such Qualified Bidder or Stalking Horse, although

3    such agent may consult with such Qualified Bidder or the Stalking Horse during the Auction by

4    telephone or email.   At the Auction, all Qualified Bidders and the Stalking Horse will be

5    permitted to increase their bids.  The first bid at the Auction will be the highest Qualifying Bid

6    selected by Seller, and identified prior to the start of the Auction. Subsequent bids may be

7    submitted by each Qualified Bidder and the Stalking Horse at the Auction (the "Increased

8    Bids") in cash increments of not less than $25,000 higher than the next previous bid.   The

9    Bankruptcy Court shall be authorized to conduct the Auction.

10          f.      At the conclusion of the Auction, Sellers shall designate the Qualified Bid or

11    the Increased Bid that is the highest and best bid (the "Highest Bid"), which Sellers will

12    recommend to the Bankruptcy Court.  However, Sellers shall not be deemed to have accepted

13    any bid unless and until such bid and Sellers' acceptance thereof have been subsequently

14    authorized by entry of the Sale and Assumption Order. Sellers shall also designate which of the

15    Qualified Bids or the Increased Bids constitute the next highest and best bids (each such bid, the

16    "Back-Up Bid").  If any party submitting a Back-Up Bid affirmatively elects to be a back-up

17    bidder (the "Back-Up Bidder") (which election must be made prior to the commencement of the

18    hearing to approve the sale to the Winning Bidder), the Back-Up Bidder shall be obligated to

19    purchase the Purchased Assets subject to the terms of the Back-Up Bid.  Unless the Back-Up

20    Bidder is then in breach of its obligation to purchase the Purchased Assets, Sellers shall return

21    the Sale Deposit of the Back-Up Bidder, if due, on the first to occur of:  (a) the closing of the

22    sale of the Purchased Assets to any person or entity other than the Back-Up Bidder, or (b)

23    thirty-five (35) days following the date on which the Sale and Assumption Order becomes a

24    final, non-appealable order if the Back-Up Bidder has not otherwise been notified by Sellers

25    that it is obligated to close. If the Back-Up Bidder receives such notification from Sellers that it

26    is obligated to close, the Back-Up Bidder shall have thirty (30) days after such notification to

27    close on its Back-Up Bid.

28          g.      Sellers shall seek the Bankruptcy Court's approval of the Highest Bid (if

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

17

Qualified Bids other than the Stalking Horse Bid have been received) or the Stalking Horse Bid (if no Qualified Bids other than the Stalking Horse Bid have been received) as the highest and best bid for the Purchased Assets (the "Winning Bid") submitted by the Stalking Horse or any Qualified Bidder, as applicable (the "Winning Bidder"). The Auction shall be conducted at the Sale Hearing. The Sale and Assumption Order shall: (i) approve the Winning Bid and the transfer of the Purchased Assets to the Winning Bidder on an "as is, where is" basis, free and clear of all liens, claims, encumbrances, and other interests therein (except as otherwise designated in the Winning Bid) (collectively, the "Transferred Interests") at the Close of Escrow, with the Transferred Interests to attach to the net proceeds of the sale of such Purchased Assets at the Close of Escrow; (ii) upon reasonable evidentiary showing, contain a finding that the Winning Bidder is a good faith purchaser pursuant to Bankruptcy Code § 363(m); and (iii) provide that the Closing Date shall be as set forth in the Bid Procedures. In the event that a Back-Up Bidder is identified to the Bankruptcy Court at the Sale Hearing, the Sale and Assumption Order shall approve the Back-Up Bid, on a contingent basis.

h.    In the event that the Winning Bidder fails to consummate the proposed transaction by the Closing Date as identified in the Purchase Agreement or Competing Bid Agreement, as applicable, such bidder's Sale Deposit shall be forfeited to Sellers as liquidated damages. Sellers may immediately consummate the proposed transaction with the Back-Up Bidder, if any, and if the Back-Up Bidder is unable to consummate the transaction in accordance with the Back-Up Bid, the Back-Up Bidder's Sale Deposit, if applicable, shall also be forfeited to Sellers as liquidated damages, all without the need for an additional hearing or order of the Bankruptcy Court.

55.    Under the circumstances, the sales procedures constitute reasonable, sufficient, adequate and proper means to provide potential competing bidders with an opportunity to submit and pursue higher and better offers for all or substantially all of the Purchased Assets. The sales procedures (i) were negotiated in good faith and at arms' length between the Debtors and the Stalking Horse, (ii) are reasonable and appropriate under the circumstances, in light of the size and nature of the transactions proposed under the Purchase Agreement as compared to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

18

comparable transactions, and have been necessary to induce the Stalking Horse to continue to pursue such transactions and to continue to be bound by the Purchase Agreement, (iii) induced the Stalking Horse to submit its bid, as memorialized in the Purchase Agreement, to serve as a minimum floor on which the Debtors, their creditors and other bidders may rely, thereby constituting a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible value for the Purchased Assets.

56.    The Purchase Agreement proposes to pay the Stalking Horse a break-up fee (the "Break-Up Fee") in the amount of $83,000 and regardless of whether they are the winning bidder at the auction, which amount is equal to five percent (5%) of the purchase price. The Break-Up Fee includes but is not limited to an expense reimbursement component for such items including attorneys' fees and costs, bank and lending fees, and other associated costs incurred in advancing the bid. The Break-Up Fee is provided in recognition of Purchaser's work in (i) establishing a bid standard or minimum for other bidders; (ii) placing estate property in a sales configuration mode attracting other bidders to the Auction; and (iii) serving, by its name and its expressed interest, as a catalyst for other bidders.

57.    The Break-Up Fee is proposed to be allowed and paid as an administrative expense claim of the Stalking Horse pursuant to Section 503(b)(1) of the Bankruptcy Code, but only upon the occurrence of: (a) the consummation of the sale of the Purchased Assets by a Winning Bidder who is not the Stalking Horse, in which case payment shall be made from the proceeds of the transaction; or (b) the termination of the Purchase Agreement by the Stalking Horse due to a material breach pursuant on the terms and conditions set forth in the Purchase Agreement. Payment of the Break-Up Fee is reasonable and appropriate in light of the commitments that have been made by the Stalking Horse and the efforts it has made and will make in connection with the Purchase Agreement.

. . .

. . .

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

# IV.
## LEGAL ARGUMENT

**A.**  **The Court May Approve a Sale of Assets Outside the Ordinary Course Where There Exists an Articulated Business Justification.**

### 1.  **Standard of Decision.**

58.  The Debtors request that the Court determine that (a) the proposed sale outside the ordinary course of the Debtors' business is appropriate; (b) the proposed sale may be made free and clear of liens, claims, interests and encumbrances; (c) the proposed sale has been entered into in good faith; and (d) the Debtors have satisfied the requirements for assuming and assigning executory contracts to the Buyer.

59.  Section 363(b)(1) of the Bankruptcy Code governs the sale of property of a bankruptcy estate, and provides, in pertinent part, as follows: "The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). For a sale pursuant to Section 363(b) of the Bankruptcy Code, a debtor must demonstrate a valid business justification to grant the request. See 240 North Brand Partners, Ltd. v. Colony GFP Partners (In re 240 North Brand Partners, Ltd.), 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988).

60.  Consistent with the foregoing, bankruptcy courts consider a wide range of factors in approving sales outside the ordinary course of business, generally including the following:

(1)  Whether a sufficient business reason exists for the sale;

(2)  Whether the proposed sale is in the best interest of the estate, which considers the following factors:

(a)  that terms of the sale are fair and reasonable;

(b)  that the proposed sale has been adequately marketed;

(c)  that the proposed sales terms have been properly negotiated and proposed in good faith; and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

(d)     that the purchaser is involved in an "arms-length" transaction with the seller; and

(3)     Whether notice of the sale was sufficient.

See Walter, 83 B.R. at 19-20.

61.     The bankruptcy court should consider all factors pertaining to the proceeding and, accordingly, act to further the diverse interest of the debtor, creditors and equity holders, alike. It is not necessary for the bankruptcy court to consider each factor listed in the cases, or to use any specific set of factors. See 240 North Brand Partners, Ltd., 200 B.R. at 659; In re Work Recovery, Inc., 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (using a six factor-test). Moreover, to the extent that any factors are utilized, there is no necessity that those factors must be given equal weight to determine the outcome. See Matter of Embrace Sys. Corp., 178 B.R. 112 (Bankr. W.D. Mich. 1995).

62.     In ruling on a motion to sell assets outside of the ordinary course of business, courts recognize that the debtor's application of its sound business judgment in the use, sale, or lease of property is subject to great judicial deference. See Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); In re Canyon P'ship, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

**2.     Application.**

63.     In the case at hand, it is appropriate to approve the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code. The orderly liquidation of the Purchased Assets is essential in order to maximize return to the Debtors' estates and creditors, to avoid the unnecessary cost and expense of the plan process and the resulting delay and further diminution of assets of the estate.

64.     The sale of the Debtors' Purchased Assets should be approved as the sale of such assets allows the Debtors to liquidate certain non-cash assets for their ultimate distribution to the Debtors' creditors through a liquidating Chapter 11 plan of reorganization. Following the Majority Equity Holders' withdrawal from the Plan, the Debtors have determined that they cannot reorganize as a going concern, and instead must be liquidated in short order. This

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

21

1  decision is primarily predicated upon the fact that the Hosted Services business component is in

2  a precarious cash and operating position, and liquidation is the most certain way to promote the

3  satisfaction of claims against the Debtors' estate.  Thus, the Debtors have entered into the

4  Purchase Agreement, thereby permitting the liquidation of their Purchased Assets for a

5  significant amount that can supplement Debtors' estates.  The Debtors have determined that it is

6  in their best interest that the Purchased Assets be sold by means of a sale outside of the ordinary

7  course of business.

8        65.    The determination to enter into the specific terms of the Purchase Agreement is

9  also based upon the Debtors' business judgment, and with a valid business justification.  The

10  sale of the Purchased Assets has been negotiated over significant discussions, and after

11  deliberation and review of potential options by the Debtors.  The proposed Purchase Agreement

12  terms have been properly negotiated and proposed in good faith, and were negotiated at arms'

13  length with the Buyer.  In determining to enter into the Purchase Agreement with the Buyer, the

14  Debtors concluded that the purchase price and other terms offered were the best available in

15  terms of net benefit for the Debtors' estates.  To the extent that a higher and better offer is

16  provided prior to or at the Sale Hearing, the Debtors will be able to select such an overbid at

17  auction for sale of the Purchased Assets, ensuring that Debtor does in fact receive the best terms

18  possible in exchange for the Purchased Assets.

19        66.    The Debtors further believe that sale of the Purchased Assets will benefit the

20  diverse interests of the Debtors and their creditors.  The proposed sale will accelerate the

21  liquidation of the Debtors' estate, and will allow the distribution of liquidated assets to creditors

22  pursuant to a plan of reorganization.  Because the proposed sale of the Debtors' Purchased

23  Assets is within the Debtors' sound business judgment, has a valid business justification, and is

24  in the best interest of the Debtors' estates, the Purchase Agreement should be approved.

25  **B.**    **The Sales Procedures Have a Sufficient Business Justification.**

26        67.    The sales procedures set forth herein are necessary and appropriate to establish

27  an orderly auction sale, and to obtain the highest and best offer for the Purchased Assets.  The

28  procedures contemplated are intended to allow for the selection of the highest and best offer for

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

22

the Purchased Assets, upon which a sale can be consummated, allowing for the preservation of sums to ultimately be distributed to creditors. In addition, the procedures require bidders to demonstrate their ability to consummate the sale transaction. This too is designed to prevent a serious loss to the Debtors if they surrender an opportunity to sell the Purchased Assets to Buyer in favor of a competing offeror only to discover that such party is incapable of completing the transaction.

68.    The instant Purchase Agreement satisfies the business judgment test should the Stalking Horse' bid constitute the winning bid at Auction. First, the Purchase Agreement was negotiated at arms' length. Other than the negotiations between the Stalking Horse and the Debtors regarding the sale of the Carrier Services business in the fall of 2010, there have been no prior dealings, co-ownership interests, or collaborative endeavors between the Debtors and the Stalking Horse, nor are there any assurances or agreements regarding future dealings between the Stalking Horse or the Debtors. Throughout the negotiations leading up to the Purchase Agreement, there were no instances of self-dealing or manipulation. The Purchase Agreement is based upon what each of the parties could negotiate with the support of their respective constituents and sponsors.

69.    Second, if the Stalking Horse is the winning bid at Auction, no other entity would have manifested sufficient, credible and timely interest in purchasing the Purchased Assets for the purchase price except for the Stalking Horse, as such other persons would have failed to provide a higher and better offer.

70.    Because the Stalking Horse is willing to purchase the Purchased Assets as set forth in the Purchase Agreement, provided this Motion is granted, the Debtors are satisfied that its bid, or a higher and better offer, will provide significant benefit to the Debtors. By setting forth procedures for the Auction, the Debtors can continue with their marketing efforts and proceed with the orderly sale of the Purchased Assets. In this regard, the bid procedures are of significant benefit to the Debtors' estates and their use is within the Debtors' sound business judgment.

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

23

C.    **The Court Should Find That the Transactions Set Forth in the Purchase Agreement Have Been Entered into in Good Faith.**

71.    In addition to proving that the proposed sale has a valid business justification, the debtor must also show that the sale is proposed in good faith. See 240 North Brand Partners, Ltd., 200 B.R. at 659 (citing In re Wilde Horse Enterps., Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)).  "Good faith" encompasses fair value, and further speaks to the integrity of the transaction. Typical "bad faith" or misconduct would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers." Id. (quoting Wilde Horse Enterps., Inc., 136 B.R. at 842).

72.    The purpose of such a finding is to facilitate the operation of Section 363(m) of the Bankruptcy Code, which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith."  Section 363(m) of the Bankruptcy Code serves the important purposes both of encouraging good faith transactions and of preserving the finality of the bankruptcy court's orders unless stayed pending appeal. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986).  If purchasers at court-approved 363 sales of property of a bankruptcy estate, and their lenders, cannot rely on the purchase agreement and transfer documents they receive at the sale, it will be difficult to liquidate bankruptcy estates at positive prices.

73.    In this case, the proposed sale has been entered into in good faith and Buyer is entitled to the safe harbor provided by Section 363(m) of the Bankruptcy Code.  The negotiations between the Buyer and the Debtors were at all times conducted at arms' length and in good faith, and there are no side agreements, arrangements, or understandings between the Debtors and Buyer, and all of the consideration to be provided by Buyer to be received by the Debtors is as set forth in the Purchase Agreement.  There is no consideration for the Purchased Assets or in connection with the proposed sale other than as set forth in the Purchase Agreement.

74.    The Purchaser is not an insider or affiliates of the Debtors.  Throughout the negotiations, the Debtors acted with the intent of obtaining the best possible deal for their

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

24

1    bankruptcy estates, both in terms of maximizing value and in structuring a transaction that best

2    comports with their financial and business needs.

3         75.    Moreover, the Debtors believe that the sale price and other terms for the

4    Purchased Assets represent the best terms available in the market.  The Debtors' negotiations

5    with other potential buyers in the marketplace and the Debtors' own awareness of the value of

6    the Purchased Assets have led the Debtors to conclude that overall, the terms of the sale,

7    including the price, are fair in the marketplace.  Though the sale price is significantly less than

8    the price offered by KeyOn, for which the Debtors sought approval in the First Sale Motion, the

9    Debtors' cash position and operating capabilities (revenue declines and personnel departures)

10    have deteriorated as a result of the passage of time and the Debtors' efforts with regard to the

11    closure of its CLEC business and the separation of its Carrier Services business unit from the

12    Hosted Services operations..  Additionally, the purchase price will be tested in this Court and

13    subject to overbids, which will ensure that the Debtors ultimately receive a fair price for the

14    Purchased Assets, whether from Leading Edge or a successful overbidder.

15         76.    As set forth herein, the terms of the sale accomplish these appropriate objectives.

16    Thus, if the Court approves the transaction as requested herein, there is no reason why it should

17    not also invoke Section 363(m) of the Bankruptcy Code to protect the good faith actions of the

18    parties from further delay and prejudice in the event this Court's order were appealed without a

19    stay.

20    **D.**     **Sale of Property Free and Clear of Liens under 11 U.S.C. § 363(f).**

21         77.    Once the Court determines that a valid business justification exists for the sale,

22    thus permitting the sale of estate assets prior to confirmation of a plan of reorganization, the

23    Court must determine whether such a sale can be made free and clear of existing liens.  The

24    Debtors do not believe that the Purchased Assets are encumbered by any liens, and therefore the

25    proposed sale will, on its face, be free and clear of liens.

26         78.    To the extent the Purchased Assets are encumbered, however, Section 363(f) of

27    the Bankruptcy Code governs the sale of property of the estate free and clear of liens under five

28    (5) conditions.  See 11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is written in the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

25

1  disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell the property

2  free and clear of liens.  See Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co.), 178

3  B.R. 198, 203 n.7 (B.A.P. 9th Cir. 1995).

4         79.    First, pursuant to Section 363(f)(2) of the Bankruptcy Code, to the extent any

5  secured creditor or lienholder that receives notice does not file a written objection to this

6  Motion, such party should be deemed to have consented to the sale of the assets.  See In re

7  Metro. Mortgage & Secs. Co., No. 04-00757, 2007 WL 2277573, at *4 (Bankr. E.D. Wash.

8  Aug. 1, 2007); In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *1 (Bankr. D.N.J.

9  May 11, 2007).

10         80.    Second, pursuant to Section 363(f)(4) of the Bankruptcy Code, to the extent that

11  a lien not of record is asserted against the assets, such lien is subject to a bona fide dispute.

12  Accordingly, the sale can and should be authorized free and clear of such liens.  See In re

13  Bedford Square Assocs., LP, 247 B.R. 140, 144-45 (Bankr. E.D. Pa. 2000); In re Octagon

14  Roofing, 123 B.R. 583 (Bankr. N.D. Ill. 1991).  A bankruptcy court must determine whether

15  there is an objective basis for either a factual or a legal dispute as to the validity of debt, but

16  need not determine the outcome of any dispute, only its presence or absence.  See In re Vortex

17  Fishing Sys., Inc., 277 F.3d 1057, 1064 (9th Cir. 2002); Austein v. Schwartz (In re Gerwer),

18  898 F.2d 730, 733 (9th Cir. 1990).  At the time of the filing of this Motion, the Debtors are

19  unaware of any liens, let alone those in bona fide dispute; however, the Debtors reserve their

20  rights to augment this Motion should such a bona fide dispute be discovered prior to the time of

21  the hearing on this Motion.

22         81.    Finally, the Debtors reserve the right to assert that the Debtors may sell under

23  Section 363(f)(5) if it becomes necessary to resort to that provision.

24  **E.**    **The Court Should Approve the Assumption and Assignment of the Purchased**

25  **Contracts Pursuant to Section 365(a) of the Bankruptcy Code.**

26         82.    Section 365(a) of the Bankruptcy Code permits the assumption of executory

27  contracts and unexpired leases, subject to the Court's approval.  See 11 U.S.C. § 365(a).

28  Section 365(f)(2) of the Bankruptcy Code provides the authority for a debtor-in-possession to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

26

1    assign executory contracts and unexpired leases. See 11 U.S.C. § 365(f)(2).

2        83.    Although Section 365 of the Bankruptcy Code does not set forth standards for

3    courts to apply in determining whether to approve a debtor's decision to assume and assign

4    executory contracts or unexpired leases, courts have consistently applied a "business judgment"

5    test when reviewing such a decision.  See Group of Inst. Invs. v. Chicago, Milwaukee, St. Paul

6    & Pac. R.R. Co., 318 U.S. 523, 550 (1943); Agarwal v. Pomona Valley Med. Grp., Inc. (In re

7    Pomona Valley Med. Grp., Inc.), 476 F.3d 665, 670 (9th Cir. 2007); Robertson v. Pierce (In re

8    Chi-Feng Huang), 23 B.R. 798, 800-801 (B.A.P. 9th Cir. 1982).  The primary concern in this

9    regard is whether the assumption benefits the bankruptcy estate.  See In re Ponoma Valley Med.

10   Grp., 476 F.3d at 670; In re Chi-Feng Huang, 23 B.R. at 801; Pacific Shores Dev., LLC v. At

11   Home Corp. (In re At Home Corp.), 292 B.R. 195, 199 (N.D. Cal. 2003).

12       84.    As applied to the case at hand, the assumption and assignment of the Purchased

13   Contracts is a necessary part of the Purchase Agreement, and thus the assumption is a proper

14   exercise of the Debtors' business judgment.

15       85.    A list of the Purchased Contracts that may be assumed and assigned to Buyer are

16   included in the Purchase Agreement and are included in the Schedule of Assigned Contracts

17   attached hereto as **Exhibit 1**.[3]  Any non-Debtor party to such an agreement that believes that its

18   agreement is not an executory contract, must file and serve a timely objection to this Motion or

19   be forever barred from asserting such objection.  All such objections must explain and include

20   documentation supporting the claim that such agreement is not an executory contract.   The

21   agreements will be assumed by the Debtors and assigned to Buyer effective upon the Closing

22   Date.

23       86.    The Debtors believe that all cure amounts which are due to any non-debtor party

24   to an executory contract or unexpired lease are contained in the Cure Schedule attached hereto

25   as **Exhibit 2**.   Any cure amounts in respect of such Purchased Contracts will be paid by the

26   Debtors within ten (10) days after the Closing Date of the sale of the Purchased Assets, except

27   ──────────────
[3] The Debtors and Buyer reserve the right to amend these schedules at any time prior to the closing, in the method
dictated by the Purchase Agreement.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc                                27

1    to the extent that the proposed cure amounts set forth in the Assignment Schedule are disputed

2    by the non-debtor party.  If any objection to the cure amount is filed and served, the Debtors

3    and Buyer reserve the right to remove the agreement from the list of agreements to be assumed

4    and assigned to Buyer.

5          87.    State law generally governs how much or what performance is necessary to cure

6    a default.  See In re Westside Print Works, Inc., 180 B.R. 557, 560 (B.A.P. 9th Cir. 1995).

7    Only defaults under the contract or lease to be assumed need be cured.  See In re Pollock, 139

8    B.R. 938, 940-42 (B.A.P. 9th Cir. 1992).

9          88.    Whether there exists "adequate assurance of future performance" as required

10    under Bankruptcy Code Section 365(b)(1)(C) of the Bankruptcy Code involves a factual

11    inquiry, requiring case-by-case consideration.  See Richmond Leasing Co. v. Capital Bank,

12    N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985); In re Lafayette Radio Elecs. Corp., 9 B.R. 993,

13    998 (Bankr. E.D.N.Y. 1981).  In the event a party to a contract or lease challenges Buyer's

14    ability to provide adequate assurance of future performance, Buyer will provide such party, or

15    the Court, with supplemental evidence of its financial wherewithal to perform the contract or

16    lease.

17    . . .

18    . . .

19    . . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

# V.
## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court order as follows:

1.     At the sales procedure hearing on April 11, 2011, approve the sales procedures proposed herein for conducting the Auction by entering the proposed form of sales procedure order attached hereto as **Exhibit 3**, and approve the proposed form of sale notice attached hereto as **Exhibit 4**;

2.     At the sale hearing on April 26, 2011, authorize and approve the sale to the Buyer, and the assumption and assignment of the Purchased Contracts to the Buyer by entering the proposed form of sale order attached hereto as **Exhibit 5**; and

3.     Grant the Debtors such other and further relief as is just and proper.

DATED: April 5th, 2011.

GORDON SILVER

By: _____
GREGORY E. GARMAN, ESQ.
MATTHEW C. ZIRZOW, ESQ.
GABRIELLE A. HAMM, ESQ.
Attorneys for Debtors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102498-002/1171214_6.doc

29